SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

**State v. Stephen F. Scharf (A-46-14) (074922)**

**Argued February 2, 2016 -- Decided July 18, 2016**

**LaVECCHIA, J., writing for a unanimous Court.**

In this appeal, the Court addresses whether it was error for the trial court to admit hearsay statements from the victim's friends and her therapist, including statements that the victim repeatedly told the witnesses of her fear of defendant. The Court further considers whether the evidence, cumulatively, constituted an abuse of the trial court's discretion that caused defendant's trial to be unjust.

In 2011, defendant was convicted of murdering his wife Jody, who fell off a cliff at the Palisades one evening in 1992, shortly after filing for divorce from defendant. Defendant put forward a defense of accident. In preparation for trial, the State's evidence included oral statements made by Jody to her friends and therapist, which were proposed for admission as going to Jody's state of mind. The State sought to use the evidence to rebut defendant's narrative that Jody's death was an unfortunate accident. The defense moved to exclude the hearsay statements. Although, the defense acknowledged that state-of-mind evidence may become probative where accident is the defense, counsel stressed the volume of potential state-of-mind evidence (the State proposed statements from twenty-six witnesses). In response, the State clarified its intent to rely on Jody's statements to only six individuals.

The trial court denied defendant's motions. The court found Jody's state of mind to be "highly probative," and determined that her statements would provide evidence to "directly counter" defendant's assertion that the fall was accidental. The court emphasized that the statements would be admitted solely to show Jody's state of mind, and directed the attorneys to prepare limiting instructions to make that clear. Concerning the proposed testimony by Jody's therapist, the court found that one of the statements -- namely, that Jody had refused defendant's invitation to the cliffs and that she had never been there before -- was admissible under N.J.R.E. 803(c)(3). The court allowed the admission of other statements made to the therapist as statements made for the purpose of medical diagnosis and treatment of depression. Again, the court asked the attorneys to prepare an appropriate limiting instruction.

On the third day of defendant's trial, the State called five witnesses to testify to the statements that are at issue in this appeal. The witnesses claimed that Jody repeatedly told them of her fear of defendant, particularly after she had served him with a divorce complaint, and told them that she had declined defendant's request to go to the Palisades cliffs with him shortly before her death. The bulk of the testimony came from the first two witnesses, Jody's friend and her therapist, and the first three witnesses testified without objection from defense counsel. Defense counsel registered an objection when the fourth witness was called, claiming that the testimony was cumulative. The court allowed the testimony to proceed, and the remaining two witnesses were brief. Throughout the testimony of those witnesses, defendant did not request a limiting instruction.

Over the next seven days of trial, the State presented testimony from fourteen witnesses concerning physical and forensic evidence obtained during the investigation into Jody's death. The evidence included testimony that Jody's injuries were "not consistent with an innocent fall," and that Jody "had to have been propelled from that point" on the cliffs given that a body from an innocent fall "could not go out that far."

Following summations, the trial court instructed the jury. The instruction provided on the state-of-mind hearsay testimony was negotiated between the parties and was what the defense had requested. The court instructed the jury that, "[i]f you find that she made these statements then you may consider them only for the purpose of determining her state of mind at the time those statements were made and for no other reason." Defendant was convicted of first-degree purposeful and knowing murder, N.J.S.A. 2C:11-3(a)(1) and N.J.S.A. 2C:11-3(a)(2).

An appellate panel reversed the conviction, concluding that the trial court erred in admitting the statements. To the panel, Jody's "expressions of fear of defendant were neither relevant nor material" and also were "highly prejudicial and clearly cumulative." The Court granted the State's petition for certification. 221 N.J. 219 (2015).

**HELD**: State-of-mind hearsay statements by a deceased about fear of a defendant, who later advances in his or her defense in a homicide prosecution a claim that the victim's death was accidental, are admissible for the purpose of proving the declarant's state of mind under N.J.R.E. 803(c)(3). Such evidence is relevant when the door is opened by the defense. A weighing for undue prejudice should follow a review for relevance under Rule 803(c)(3).

1. The Evidence Rules limit the admissibility of hearsay testimony. One exception allowing for the admission of hearsay is the state-of-mind exception, N.J.R.E. 803(c)(3). When a matter places a declarant's state of mind in issue, the Rule allows a declarant's out-of-court statement to be admitted for that singular purpose. The state-of-mind exception does not broadly allow admission of a victim's recounting of a defendant's threats. However, declarations of fear can be admitted to establish that the decedent was not the aggressor, did not commit suicide and was not accidently killed, provided that those matters satisfy the relevancy requirement. When accident is proffered as the explanation for a death, the state-of-mind hearsay exception has been used to admit testimony about a decedent's prior statements. See United States v. Brown, 490 F.2d 758, 767 (D.C. Cir. 1973). Other jurisdictions similarly recognize that a homicide victim's prior statements of fear of a defendant are both relevant and admissible -- through state-of-mind testimony -- if the defendant in the case is claiming that an accident occurred. (pp. 25-29).

2. This is the first case in which the Court is squarely in a position to pass on whether state-of-mind hearsay may be admitted to rebut a defense that the victim's death was accidental. New Jersey's case law previously suggested that such evidence was admissible. The Court now holds that state-of-mind hearsay statements by a deceased about fear of a defendant, who later advances in his or her defense in a homicide prosecution a claim that the victim's death was accidental, are admissible for the purpose of proving the declarant's state of mind. Such evidence is relevant when the door is opened by the defense, as occurred here. (pp. 29-30).

3. Having determined that state-of-mind evidence is relevant when defendant advances an accidental-death theory, the Court assesses whether the trial court abused its discretion in admitting the evidence. The court was specific in what it allowed: statements of fear of defendant; statements about defendant's abusive conduct toward Jody, but not specific acts; statements about her fear of heights; and statements about her intent to continue with the divorce. The court cautioned that it was allowing limited reference to alleged domestic violence only for the "singular purpose" of showing Jody's state of mind. Importantly, the court stated that it would not permit any of the testimony to be used to prove defendant's motivation or conduct. Based on the argument advanced pretrial, the Court finds no error in the trial court's admissibility determination. The testimony was relevant to disputed, material factual issues about Jody's state of mind toward defendant, about her marital relationship, and about her likely conduct. (pp. 30-34).

4. The Court next addresses how the statements were handled at trial. Notably, the defense did not object to the content of the testimony of the first three witnesses who testified to statements Jody made to them. Nor did counsel request or suggest any limiting instruction at the time. Instead, the defense objected to the cumulative nature of the two remaining witnesses after the fourth witness was called to the stand. The Court views the testimony of the fourth and fifth witnesses from the vantage point of the trial court as the testimony unfolded. Plainly, the witnesses were the tail of this testimony. That day, the State presented a total of five witnesses, and counsel did not object until the short presentations of the fourth and fifth witnesses. Overall, the objected-to testimony was brief, covered some different ground, and was not cumulative to the point of being erroneously admitted. (pp. 34-36).

5. On appeal, defendant advanced arguments not presented to the trial court: Defendant argued that the prejudicial content of Jody's statements required their exclusion, and that the jury instructions on the use of the state-of-mind evidence were inadequate. Here, the better practice would have been for the trial court to have limited the state-of-mind testimony. However, the evidence of the five witnesses, presented on a single day of this multi-day trial, was not an overriding part of the State's presentation; the great bulk of the State's case, presented over many days, focused on the investigation and forensic evidence. The jury also was told by the court to use the statements only for the purpose of understanding Jody's state of mind. Thus, the Court does not perceive the admission of the evidence to constitute plain error. Nor does the Court find plain error in the jury instruction. In light of the manner in which the trial court solicited input and engaged with counsel over a proper limiting instruction, the result here was a negotiated charge that the Court cannot say caused defendant's trial to be unjust. (pp. 36-41).

6. Having addressed the arguments raised in this matter, the Court highlights its concerns about dangers associated with use of state-of-mind testimony about a declarant's fear of a defendant. Care must be taken to guard against undue prejudice and the risk that the jury may misuse the evidence. Accordingly, trial courts are obligated to perform an express Rule 403 weighing of evidence in addition to an assessment for relevance of the victim's state-of-mind testimony under Rule 803(c)(3). A weighing for undue prejudice should follow a review for relevance

under <u>Rule</u> 803(c)(3).  In addition to the court's ability to exclude such evidence, the trial court should consider limiting its amount, including redacting or sanitizing it as appropriate, to balance the interests of the proponent of the testimony and that of the party against whom it is used.  Further, a proper limiting instruction is necessary to guard against the risk that the jury will consider the victim's statements of fear as evidence of the defendant's intent or actions.  The better practice, whether requested or not, is to tailor the charge on how to use the state-of-mind evidence to the facts and to tell the jury how the evidence may be used and how it may not be used.  (pp. 41-45).

The judgment of the Appellate Division is **REVERSED** and the matter is remanded for consideration of defendant's unaddressed appellate arguments.

**CHIEF JUSTICE RABNER; JUSTICES ALBIN, FERNANDEZ-VINA and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE LaVECCHIA's opinion.  JUSTICE PATTERSON did not participate.**

STATE OF NEW JERSEY,

 Plaintiff-Appellant,

  v.

STEPHEN F. SCHARF,

 Defendant-Respondent.


  Argued February 2, 2016 – Decided July 18, 2016

  On certification to the Superior Court,
  Appellate Division.

  Catherine A. Foddai, Senior Assistant
  Prosecutor, argued the cause for appellant
  (John L. Molinelli, Bergen County
  Prosecutor, attorney).

  Stephen W. Kirsch, Assistant Deputy Public
  Defender, argued the cause for respondent
  (Joseph E. Krakora, Public Defender,
  attorney).

  Ian C. Kennedy, Deputy Attorney General,
  argued the cause for amicus curiae, Attorney
  General of New Jersey (John J. Hoffman,
  Acting Attorney General, attorney; Mr.
  Kennedy and Daniel I. Bornstein, Deputy
  Attorney General, of counsel and on the
  briefs).

 JUSTICE LaVECCHIA delivered the opinion of the Court.

 Defendant Stephen Scharf was convicted of first-degree purposeful and knowing murder of his wife Jody, who fell to her death off a cliff at the Palisades. Defendant put forward a

defense of accident.  During the trial, the court allowed the State to present, in rebuttal to the defense of accident, hearsay statements, under N.J.R.E. 803(c)(3) and (c)(4), from Jody's friends and her therapist.  The witnesses claimed that Jody repeatedly told them of her fear of defendant, particularly after she had served him with a divorce complaint, and told them that she had declined defendant's request to go to the Palisades cliffs with him shortly before her death.

On appeal, the Appellate Division reversed the conviction because the reviewing court concluded that the trial court erred in admitting the hearsay statements.  The case is before us on the State's petition for certification.  State v. Scharf, 221 N.J. 219 (2015).  The appeal requires us to address whether it was error for the trial court to have admitted the evidence and, even if the evidence was admissible, whether the evidence, cumulatively, constituted an abuse of the trial court's discretion that caused defendant's trial to be unjust.

I.

A.

On September 20, 1992, Palisades Interstate Parkway police officers responded to a report that a person had fallen from the Englewood cliffs.[1]  First responder, Officer Paul Abbott,

---

[1] To place the legal issue in context, we summarize the facts as they were presented during the trial.  Because the murder for

explained in his testimony that the cliffs provide a scenic lookout across the Hudson River. When Abbott arrived at the scene at approximately 8:12 p.m., it was already dark. Defendant approached Abbott in the parking area and told him that his wife had fallen from the cliff. Abbott drove defendant to the northern end of the cliffs -- the area from which defendant said that his wife had fallen. Officer Lowell Tomayo, who responded to the scene with Abbott, followed in a second vehicle. Upon arriving at the northern end of the cliffs, defendant guided the officers on foot down an unmaintained and overgrown path into a wooded area.

According to testimony from Abbott and Tomayo, the officers and defendant eventually reached the edge of the cliff, and defendant indicated the precise spot from where his wife had fallen, pointing to a flat rock that jutted out from the cliff. A fence separated the wooded area from the cliff's edge. The officers crossed the fence and called Jody's name, but received no response. The officers saw a pocketbook lying approximately eight feet below the cliff; it was later identified as belonging to Jody. Jody's body was recovered late that night. Forensic

---

which defendant was convicted occurred in 1992 and the trial took place in 2011, the proceedings that explain that delay are also recounted.

3

examination of her body established that, at the time of her death, she had a blood alcohol content of 0.12%.

Defendant was escorted to police headquarters, where he spoke with Detective Ronald Karnick and gave a written statement concerning what had happened that evening. In that statement, defendant told Karnick that he and his wife had planned to go into New York City to a comedy club that evening, that the lookout on the cliff had been "their spot," and that they had been drinking in their car prior to walking to the lookout point. Defendant said that he and Jody walked down the trail, climbed through the fence, and sat on the flat rock that he had shown to the officers earlier. According to defendant, he and Jody began engaging in amorous activities, at which point Jody indicated she was uncomfortable so he offered to retrieve a blanket and some wine from the car. Defendant said that he and Jody both stood up, and then Jody suddenly fell forward off the rock. Defendant said that he called her name but received no response.

Karnick obtained defendant's permission to search his vehicle and found in it a cooler, a wine glass, two wine coolers (one full, one empty), a bottle of wine, a knife, a blanket, some bandages, two white towels, a candle, a receipt, a box of crackers, a jewelry box containing a cross and a "gold-type chain," and a claw hammer.

4

As the investigation continued, subsequent questioning of defendant uncovered additional information. Defendant revealed that, two weeks prior to her death, Jody served defendant with a divorce complaint that alleged defendant was abusive and unfaithful. Defendant told investigators that Jody was a heavy drinker and that both he and she had dated other people as part of an open marriage. However, defendant told the investigators that he had ended his relationships with the other women and hoped that a "trip to the cliffs" would lead to his and Jody's reconciliation.

In an interview a few days after Jody's death, defendant stated that he and his wife had planned to go out to dinner and then to New York City on September 20, 1992, the evening of her death. Defendant told the officers that, the night before, he and Jody had dined out together with their son, but on the next evening, which was a Sunday, they arranged for someone to watch their son. They were on the way to New York City, from their home in Morris County, when, defendant claimed, he and Jody decided to make a detour to the cliffs.

At the time of law enforcement's initial investigation into the circumstances of Jody's death, interviews of Jody's friends and acquaintances called into question several of defendant's assertions, including Jody's state of mind, her activities, and her interactions with defendant leading up to her death. Also,

5

according to the testimony of the investigating officers, defendant's responses to repeated questioning revealed inconsistencies, including differing versions of how the fall occurred, and some inculpatory indications. Nonetheless, the criminal investigation into the circumstances of Jody's death did not lead initially to charges being filed against defendant. However, certain events that occurred after Jody's death and before defendant's indictment bear notice at this point.

At the time Jody died, the medical examiner concluded that the cause of death was "multiple fractures and injuries"; however, the examiner remained uncertain about the "manner of death" and listed it as "pending investigation" on the death certificate. The medical examiner amended the "manner of death" in 1993 to "could not be determined."

The record also reveals that, during the year prior to her death, defendant obtained a life insurance policy on Jody in the amount of $500,000 -- $300,000 as a basic amount of insurance and $200,000 as an accidental death benefit. After Jody's death, defendant did not file a claim for the proceeds of that policy. After the proceeds had remained unclaimed for the lawfully required number of years, the insurer forwarded the monies to the State as unclaimed funds. See N.J.S.A. 46:30B-9, -22. In 2003, defendant claimed the money held by the State, which had grown to $770,650.83 with interest.

6

The Bergen County Prosecutor's Office reevaluated the circumstances of Jody's death in 2004, and for the first time, the medical examiner went to the location at the cliffs to view the area where Jody fell and where her body was recovered.

After reinvestigation of the matter, in 2007, the medical examiner amended the "manner of death" on Jody's death certificate from "could not be determined" to "homicide." The Bergen County Prosecutor's reevaluation of the evidence and follow-up interviews, detailed in the discussion of the trial testimony, led to a decision to pursue a murder charge against defendant for the 1992 death of his wife.

A grand jury indicted defendant for first-degree purposeful and knowing murder, N.J.S.A. 2C:11-3(a)(1) and 2C:11-3(a)(2).

## B.

As noted, defendant proffered a defense of accident. The State's evidence in preparation for trial included oral statements made by Jody to her friends and to her therapist, which were proposed for admission by the State as going to the state of mind of the victim. The State sought to use the evidence to rebut defendant's narrative that Jody's death was due to an unfortunate accident that took place when he and she were alone on the cliffs on the evening of Sunday, September 20, 1992.

The defense filed a pretrial motion to exclude Jody's hearsay statements. At the pretrial hearing on the motion, defense counsel "acknowledge[d] that where accident is the defense [state-of-mind evidence] may become probative." However, defense counsel stressed the large volume of potential state-of-mind evidence that was proffered by the State (there were thirty-four potential statements from twenty-six witnesses), arguing that the trial court needed to determine whether the statements made by Jody were made in good faith at the time when they were spoken. In response to the motion, the State whittled down its list of proposed witnesses on this issue. It clarified its intent to rely on Jody's statements to six individuals regarding her state of mind around the time of her death.

In a written decision issued April 11, 2011, the trial court denied defendant's motions to exclude the proposed testimony of Jody's statements to friends and to exclude the statements made to her therapist. The trial court acknowledged that twenty-six individuals had provided the State with approximately thirty-four statements made by Jody, but that the State had narrowed that list down to the ones before the court. The court stated that it carefully reviewed those statements prior to ruling to assess whether they contained admissible evidence. After reviewing the state-of-mind hearsay exception

8

under N.J.R.E. 803(c)(3), and noting that defendant was arguing that Jody's fall was accidental, the court stated that "New Jersey courts have recognized that when a defendant claims that the victim's death was accidental, then the victim's state of mind becomes relevant and the victim's statements of fear become[] admissible." The court found Jody's state of mind to be "highly probative" on the issues to be tried in this matter and concluded that the State should be permitted to introduce the testimony of the six witnesses who would tell of Jody's expressed fear of defendant and of his abusive conduct, her expressed intent to continue with the divorce proceedings initiated against defendant, and her expressed fear of heights.

According to the trial court, Jody's statements to those six identified individuals were made close enough in time to the events of September 20, 1992 and would provide evidence that would "directly counter" defendant's assertion that Jody's fall from the Palisades cliffs while alone with defendant was accidental. The court specifically stated that it would allow limited reference to alleged domestic violence to be elicited from the witnesses and only for the "singular purpose" of showing Jody's state of mind. However, the court warned that the statements would not be permitted to "prove the defendant's motivation or conduct" and emphasized that "[t]hese statements are solely admissible to show Jody's state of mind." The court

directed the attorneys to prepare limiting instructions that would be provided to the jury in order to make that distinction clear.

Concerning the proposed testimony by Jody's therapist, the court found that a statement made by Jody to the therapist -- namely, that she had refused defendant's invitation to accompany him on a picnic to the Palisades and that she had never been to that spot before -- was admissible under N.J.R.E. 803(c)(3). The court considered the statement to relate to the "relationship between Jody and defendant" and to be part of "the 'mosaic' of the event." The court explained that the fact that Jody told her therapist that she had never been to the Palisades was "part of the totality of her relationship with the defendant and placed in issue the defendant's version of their marital relationship."

The court allowed the admission of other statements made by Jody to her therapist under N.J.R.E. 803(c)(4) as statements made for the purpose of medical diagnosis and treatment. To that end, the court found that "the statements relating to both the cause and symptoms of Jody's depression carr[ied] with them inherent reliability because Jody would necessarily have believed that effective treatment . . . was largely dependent upon the accuracy of the information provided to" her therapist. In admitting that testimony, the court stated it was convinced

10

that Jody's statements to her therapist were "medically necessary for effective treatment," adding that it considered it appropriate to allow the therapist's testimony "as to cause, symptoms and feelings Jody conveyed to her while she was treating Jody for depression."  Again, the court asked the attorneys to prepare an appropriate limiting instruction that would discuss the purpose for which this evidence could be considered by the jury.

C.

Defendant's jury trial began with opening statements on April 19, 2011.  Over the entire first two days of trial, the State called three witnesses:  Jonathan Scharf, the son of Jody and defendant, and two women with whom defendant had had extramarital relationships.

Jonathan's testimony was damaging to his father, although the defense brought out differences between Jonathan's interview at the time of his mother's death when he was a child, and which was apparently not recorded, and his recorded testimony at the time of his father's arrest, as well as additional information that did not come out until trial.[2]  Undermining the narrative

---

[2] Defense counsel pointed out inconsistencies between Jonathan's testimony on direct examination and his statements to police shortly after defendant was arrested.  Jonathan explained those inconsistencies by admitting that he was afraid of his father and held back in his second interview, even though he was an adult at the time.  Jonathan stated that he was concerned that

11

presented by defendant to police interrogators, Jonathan, who was ten years old at the time of his mother's death, testified that he accompanied his parents when they went out to dinner the Saturday night before Jody's death because Jody had not wanted to go out alone with defendant; she had insisted that Jonathan had to be with them. He also testified that his parents had never been to the cliffs before the date of the incident. His testimony also included reference to his mother's fear of heights, even to the extent that she would not climb a step ladder because of that fear.

The two women who had extramarital affairs with defendant also provided damaging testimony, specifically recounting statements by defendant that negated his assertion that he had ended his extramarital relationships with them.

T.S. testified that she began dating defendant in 1990 and that after about six to seven months, he began to regularly spend three nights per week at her home. T.S. testified that defendant never expressed a desire to end their relationship. Defendant had told T.S. that he was not married -- he claimed that his wife had died in a car accident in Georgia ten years earlier -- and that he had fathered his son Jonathan with a

---

defendant might try to harm Jonathan's wife and that he wanted to be sure defendant was in custody before he disclosed some of the events about which he testified.

12

"career woman" who lived in the same residential complex as him but who did not want to get married. According to T.S., defendant told her that the custody arrangement over Jonathan was "amicable." At some point, defendant mentioned the possibility of marriage. Although T.S. was not interested in marriage, the relationship continued. More specifically to the time period of Jody's death, T.S. testified that defendant did not join her as planned on a long Labor Day weekend trip in September 1992. Arriving late, defendant told her that he was under a lot of stress, apologized, and stated that, if T.S. would "give [him] to the end of September . . . everything will be okay, the stress will be -- a lot of the stress will be gone."

The other woman who testified, K.S., met defendant in 1990 through a newspaper dating advertisement. Defendant told K.S. that he was divorced and had a son. As they continued to see each other, defendant later admitted that he was married, but claimed that he was planning to get a divorce. K.S. stated that she contacted Jody by phone and that Jody also told her that she and defendant were separated and that they dated other people. The relationship between K.S. and defendant ended shortly thereafter.

K.S. testified that defendant continued to contact her through the end of 1990 into 1991 and that, in the early part of

13

1992, K.S. began to see defendant again once defendant informed her that Jody was going to file for divorce. K.S. stated that defendant even showed her in July of 1992 the as-yet unserved divorce papers that Jody's attorney had prepared.[3]

In her testimony, K.S. described her relationship with defendant in September 1992 as "serious," stating that the two had briefly discussed marriage. Defendant had never expressed a desire to end their relationship, according to K.S. She testified that defendant called her to inform her of Jody's death, explaining that they had gone to the Palisades and Jody had fallen from a rock.

It was on the third day of the trial that the State called five witnesses to testify to the statements, made by Jody to them, that are at issue in this appeal. The testimony of all five individuals was completed that day. The great bulk of the testimony that day came from the first two witnesses, M.H., Jody's friend, and Patricia Teague, Jody's therapist.

M.H. testified that she and Jody became friends because they frequented the same lunch spot when the two were in the same area conducting business. She stated that Jody was "very frightened of [defendant]." M.H. described how, in the month

---

[3] Examination of the record reveals that, in July, Jody had filed for divorce but that the papers had not yet been served on defendant. The papers were served in September, shortly before her death.

leading up to Jody's death, Jody frequently mentioned her fear of defendant, stating that she "felt he was going to really hurt her."  Having gone through a divorce fifteen years earlier, M.H. had discussed with Jody taking steps toward a divorce.  Jody confided in M.H. around the time that she served defendant with divorce papers in the late summer of 1992, telling M.H. that she "was very afraid" and that she feared that "once these papers are served on [her] husband . . . something's going to happen to [her]."  M.H. added that Jody was "very afraid for her life" and "very afraid that he was going to kill her."  According to M.H., Jody said that "if anything happens after this, I want you to know who did it."  Defense counsel did not object during M.H.'s testimony.

The second witness, Jody's therapist, Patricia Teague, testified that "verbal, mental physical abuse" led to Jody's feelings of serious depression, which were the focus of their sessions together.  Teague also stated that in the course of their discussions Jody had told her that she had never been to the cliffs and that, although defendant recently had invited her to go with him to the cliffs, she had told Teague that she did not intend to go there ever with defendant.  Defense counsel did not object to this testimony.

The third witness was M.G., who testified that she knew Jody because she worked at a restaurant frequented by Jody and

15

her son, when he had activities going on in a park nearby, or sometimes by Jody alone.  M.G. testified that she last saw Jody on the Saturday before she died when Jody came into the restaurant.  Because she was busy with customers, M.G. was unable to talk with Jody, but she was passed a note from Jody, which informed her that Jody had served defendant with divorce papers on Friday and that defendant "was very unhappy about it and . . . she was kind of afraid."  Although in the note Jody had asked M.G. to call her later, M.G. did not.  By way of background, M.G. explained that she and Jody had discussed Jody's marital problems in previous conversations and how Jody wanted defendant out of the house.  On cross-examination, M.G. added that she had encouraged Jody to take legal action to help herself.  Again, defense counsel did not object.

When the fourth witness, M.D., was called to the stand, defense counsel requested to be heard at sidebar.  In that exchange, defense counsel registered an objection to the next witnesses, claiming that the testimony was cumulative.  Counsel stated, "I expect the Prosecutor basically to put another three witnesses [on] to say the exact same thing that Jody says, she was afraid of my client and I think it['s] gotten to the point where it's cumulative and that it shouldn't proceed any further. All these witnesses are basically going to say the exact same thing."  The prosecutor responded that each witness came from a

16

different part of Jody's life and asserted the right to present those different perspectives. The court allowed the testimony to proceed, stating: "Okay. All right. The objection is that it's cumulative. Let's see what they have to say. You can make further objections."

The remaining two witnesses were brief, comprising respectively twelve and ten pages of transcript, direct and cross-examination combined.

M.D., defendant's and Jody's neighbor, testified that she last saw Jody on the Saturday before she died because she was working at the same restaurant as M.G. M.D. stated that Jody told her that she had filed for divorce, that she had served defendant with divorce papers, and that defendant had refused to sign the papers and threatened her life. M.D. also stated that Jody had "feared for her life" and that defendant had told her, upon receiving the divorce papers, that "he would see her dead before he'd let her -- before he would sign them." Defense counsel did not object to that content but, at the conclusion of M.D.'s testimony, stated that he was "just making that continuing objection that [he] made at last sidebar."

The last witness called by the State that day was A.R., who worked as a bartender at the restaurant where Jody and M.H. would meet for lunch on workdays. According to A.R., Jody had told her that defendant was abusive and had shown A.R. a photo

17

of defendant after she filed for the divorce so A.R. could recognize him, and let Jody know if he ever came into the restaurant. She also stated that, when she saw Jody the Friday before she died, Jody was very upset and told her that she "was afraid [defendant] was going to kill her because of the divorce." Defense counsel did not object.

Throughout the testimony of those witnesses, defendant did not request a limiting instruction to the jury, despite the court's pretrial request for counsel to develop and propose a limiting instruction for the court's use. The topic of a limiting instruction did not come up until the charge conference.

Over the next seven days of the trial, the State presented testimony from fourteen witnesses concerning physical and forensic evidence obtained during the investigation into Jody's death. The State called the investigating officers who responded to the scene the evening of Jody's fall, the ones who were responsible for executing consent searches of defendant's vehicle and residence, and the ones who later interviewed defendant. Those officers discussed certain behaviors exhibited by defendant during their investigation and how his statements were, at times, inconsistent. One officer who was with defendant during the search of defendant's residence, testified that defendant said to him "you don't believe this was an

18

accident." The officer responded that he did "believe an accident happened," but that when he in turn asked defendant if it was, defendant shook his head somewhat and replied "no" as he put his head down. Another officer who was present also testified to witnessing that exchange.

Also testifying for the State were members of the rescue team involved in recovering Jody's body. The State then presented the testimony of a land surveyor, who had measured the height of the cliffs, and an investigator who took measurements of the area and conducted and videotaped experiments that involved throwing sandbags matching Jody's weight off the cliff. Finally, the State called two forensic pathologists, one of whom had composed the autopsy report. A summary of their testimony follows.

Dr. Maryann Clayton, who performed the autopsy on Jody, initially noted that the majority of Jody's injuries were to her head and face, as well as to the right side of her body. At the time the autopsy was performed, Dr. Clayton determined that the cause of death was multiple fractures and injuries, but the manner of death was listed as "pending investigation" on the original death certificate. Dr. Clayton also noted at that time that she found it unusual that there were no visible indications of abrasions, lacerations, or contusions on the back surface of

Jody's body, nor were there any breaks in her arm, pelvic, or leg bones.

In January 1993, Dr. Clayton concluded that the manner of death could not be determined and an amendment to the death certificate was entered. In January of 2006, as part of a reinvestigation into Jody's death, Dr. Clayton journeyed for the first time to the bottom of the cliffs to view the place from which Jody's body was recovered. That different perspective led Dr. Clayton to conclude that Jody's injuries were "not consistent with a patient that passively rolls down the cliffs to the bottom and meets their demise." Dr. Clayton also noted that Jody's injuries were unlike those of other individuals who had died as a result of falling from a high distance. Dr. Clayton thus concluded that Jody had to have experienced a "propulsive force," meaning that "[s]he had to be propelled out to be able to reach" the tree that she struck on the way down. Dr. Clayton then amended the manner of Jody's death to homicide.

The other forensic pathologist, Dr. Michael Baden, became involved with the case in 2004 when contacted by the Prosecutor's Office during the reinvestigation into Jody's death. Dr. Baden noted that the distance from the point where an individual fell to where the individual landed is an important factor in determining the manner in which someone fell. For example, Dr. Baden stated that a person who fell

20

accidentally would be "within a couple of feet of the base" from which he or she fell while a person who is propelled would be a "much larger" distance away. With that in mind, Dr. Baden concluded that Jody's injuries were "not consistent with an innocent fall from the point indicated at that lookout area." Dr. Baden, like Dr. Clayton, also concluded that the manner of death was homicide, given that a body from an innocent fall "could not go out that far" and that Jody "had to have been propelled from that point" on the cliffs.

Summations occurred on May 24, 2011, and the trial court instructed the jury that same day. The instruction provided on the state-of-mind hearsay testimony was negotiated between the parties and was what the defense had requested. The court instructed the jury that, "[i]f you find that she made these statements then you may consider them only for the purpose of determining her state of mind at the time those statements were made and for no other reason."

Defendant was convicted of first-degree purposeful and knowing murder, N.J.S.A. 2C:11-3(a)(1) and N.J.S.A. 2C:11-3(a)(2), and was sentenced to life in prison, subject to thirty years of parole ineligibility.

Defendant appealed, and the Appellate Division reversed his conviction. The primary issue for the panel was whether the trial court erred in admitting the hearsay statements from

Jody's friends and therapist. To the panel, Jody's "expressions of fear of defendant were neither relevant nor material" and also were "highly prejudicial and clearly cumulative."

The panel determined that Jody's statements were not relevant because her state of mind was not at issue. According to the panel, Jody's "fear of defendant, even if based on their past history, simply does not make it more or less likely that, once having gone to the Englewood Cliffs with defendant, while she was under the influence of alcohol, an accident could not have occurred." To that end, the panel noted that "[t]here is no reason that the victim's fear of defendant would have made it less likely that an accident occurred." Additionally, the panel did not find a connection between Jody's state of mind and her conduct, because, regardless of her fear of defendant, there had been testimony at trial that she had spent time with defendant the night before her death. According to the panel, the prejudicial impact of evidence of Jody's fear outweighed any probative value.

The panel reached the same conclusion regarding Teague's testimony with "regard to [Jody's] fear of defendant and any history of domestic violence." Those statements were determined not to meet the standard for relevancy under N.J.R.E. 401 because the panel did not view Jody's "state of mind, her fear, and the alleged abuse inflicted by defendant [as] probative on

22

any issue in the case." The panel further held Jody's statement to Teague -- that she had never been to the cliffs and declined defendant's invitation to go there with him -- was also inadmissible.

The panel concluded that those errors were "clearly capable of producing an unjust result," R. 2:10-2, reversed defendant's conviction, and remanded the matter for retrial.

We granted the State's petition for certification. We also granted amicus curiae status to the Attorney General of New Jersey.

II.

The State argues essentially the same points made to the Appellate Division. It maintains that evidence of Jody's state of mind was relevant to counter the defense that Jody's death was accidental and was admissible under hearsay exceptions. The testimony was limited to only five witnesses and was kept limited to a proper purpose. The State maintains that admission of the evidence was not error but rather a proper exercise of the trial court's discretionary role as the gatekeeper of evidence permitted to be introduced at trial. As for the court's charge to the jury, the State notes that the defense did not provide the court with any specific proposal or request with respect to limiting instructions that would have been more

23

adequate than what the trial court provided. Thus, the State contends that defendant's trial was not unjust.

The Attorney General's arguments support those advanced by the State, emphasizing that the charge delivered to the jury was a negotiated one.

The defense urges affirmance of the Appellate Division's judgment. It argues that Jody's state of mind is not relevant because the State failed to show how Jody's fear of defendant makes it more or less likely that defendant intentionally pushed Jody from the cliff rather than that she had an accidental fall. To that end, defendant contends that hearsay declarations of a decedent's fear of a defendant are generally inadmissible because the decedent's state of mind -- that he or she was fearful of a defendant -- is not relevant to answering the principal question in a homicide trial: whether the defendant killed with the requisite state of mind. Testimony regarding Jody's state of mind at the time of her death cannot be used, according to defendant, to infer defendant's actions on the night of her death.

Moreover, defendant continues, the statements are highly prejudicial because "[they] raise[] in the jurors' minds the specter of a frightening defendant worthy of the decedent's fear." According to defendant, our case law requires that courts look to whether the declarant's state of mind actually

24

proves any matter in the dispute or whether it serves to simply inflame the prejudice of the jury. Thus, defendant emphasizes that any testimony regarding Jody's fear of defendant should have been regarded as inadmissible hearsay due to its "extreme potential to inflame the jury."

## III.

## A.

In this review of the admission of hearsay testimony about the decedent's expressions of fear of her husband uttered shortly before her death under unusual circumstances, we must begin with basics.

Evidence must be relevant for it to be admissible, meaning that it must have "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401; see State v. Darby, 174 N.J. 509, 519 (2002) (explaining that "the inquiry should focus on the logical connection between the proffered evidence and a fact in issue" (quotation marks omitted)). In the search for the truth, all relevant evidence is admissible unless otherwise excluded by the New Jersey Rules of Evidence. See N.J.R.E. 402.

The Evidence Rules take special care to limit the admissibility of hearsay testimony. See N.J.R.E. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in

evidence to prove the truth of the matter asserted").
Generally, hearsay is not admissible, "except as provided by
[New Jersey's rules of evidence] or by other law." N.J.R.E.
802.

One exception allowing for the admission of hearsay is the
state-of-mind exception. N.J.R.E. 803(c)(3) provides:

> A statement made in good faith of the
> declarant's then existing state of mind,
> emotion, sensation or physical condition (such
> as intent, plan, motive, design, mental
> feeling, pain, or bodily health), but not
> including a statement of memory or belief to
> prove the fact remembered or believed unless
> it relates to the execution, revocation,
> identification, or terms of declarant's will.

When a matter places a declarant's state of mind in issue, the
Rule allows a declarant's out-of-court statement to be admitted
for that singular purpose. State v. Benedetto, 120 N.J. 250,
255-56 (1990). The exception is applied carefully; hearsay
testimony is admissible on state of mind when it is relevant and
bears a logical connection to the issues at trial. State v.
McLaughlin, 205 N.J. 185, 189 (2011). Our case law bears out
that cautious approach.

When it comes to an expression of fear by the out-of-court
declarant, the state-of-mind exception is analyzed carefully
concerning its relation to the issues at trial and whether the
hearsay should be permitted for a limited use. The state-of-
mind exception to the hearsay rule does not broadly allow

26

admission of a victim's recounting of a defendant's threats. See, e.g., Benedetto, supra, 120 N.J. at 259-61 (finding that victim's statements describing threats were "not relevant to any issue and not explanatory of how defendant had acted on the night of [the victim's death]"); State v. Downey, 206 N.J. Super. 382, 392 (App. Div. 1986) (noting weight of authority supporting same).

However, declarations of fear can be admitted "to establish[] that the decedent was not the aggressor, did not commit suicide and was not accidently killed," provided that those matters satisfy the relevancy requirement. State v. Machado, 111 N.J. 480, 485 (1988) (citing Downey, supra, 206 N.J. Super. at 392-93); see also State v. Calleia, 206 N.J. 274, 292 (2011) (noting general guidance that "declaration of the victim's state of mind . . . should not be used to prove the defendant's motivation or conduct" (quotation marks and citation omitted)). A victim's state-of-mind hearsay statements are relevant to assessments of his or her own actions, and thus such statements can be relevant in the assessment of the truth of another's stated reasons for conduct that occurred with that victim. Calleia, supra, 206 N.J. at 296.

More specifically to the matter at hand, when accident is proffered as the explanation for a death, the state-of-mind hearsay exception has been used to admit testimony about a

27

decedent's prior statements. In United States v. Brown, 490 F.2d 758, 767 (D.C. Cir. 1973), the D.C. Circuit observed that "courts have developed three rather well-defined categories in which the need for [state-of-mind evidence] overcomes almost any possible prejudice": (1) when a defendant is claiming self-defense; (2) when a defendant proffers a defense on the ground that the deceased committed suicide; and, of relevance to the present appeal, (3) when a defendant claims that there was an accidental death. Although finding undue prejudice in the statements in issue before the court, the Brown panel noted that this type of state-of-mind testimony possesses a "significant degree of relevance." Ibid. Indeed, it is generally accepted that "such statements are admissible where the defense claims self-defense, suicide, or accidental death because in each of those situations the statements look to the future in that decedent's fear makes unlikely and thus helps to rebut defense claims about the decedent's subsequent conduct." 2 McCormick on Evidence § 276 at 403-04 (Broun ed., 7th ed. 2013).

Courts in other jurisdictions similarly recognize that a homicide victim's prior statements of fear of a defendant are both relevant and admissible -- through state-of-mind testimony -- if the defendant in the case is claiming that an accident occurred. See, e.g., Jones v. United States, 398 A.2d 11, 12-13 (D.C. 1979) (finding state-of-mind testimony to be admissible

28

where defendant claimed victim accidentally fell down stairs); State v. Richards, 552 N.W.2d 197, 209 (Minn. 1996) (finding that, because defendant raised accident and/or suicide as defense to homicide charge, victim's state of mind was relevant and trial court did not err in admitting state-of-mind testimony); State v. Crawford, 472 S.E.2d 920, 927 (N.C. 1996) (concluding that victim's state of mind was relevant "to the issues involved in the instant case, including explaining and refuting defendant's claims of self-defense and accident"); State v. Aesoph, 647 N.W.2d 743, 757 (S.D. 2002) (finding victim's state-of-mind testimony was admissible and noting that "it is well understood that a murder victim's statements, regarding fear of the accused, are admissible to rebut a defendant's claim of accidental death" (citations omitted)); Clay v. Commonwealth, 546 S.E.2d 728, 730 (Va. 2001) (determining that trial court committed no abuse of discretion in admitting victim's statements regarding fear of accused because defendant claimed victim's death was accidental and because victim's statements were relevant and probative of whether accidental nature of death was likely).

This is the first case in which we are squarely in a position to pass on whether state-of-mind hearsay may be admitted to rebut a defense that the victim's death was accidental. Our case law previously suggested that it was

29

admissible; we now hold that state-of-mind hearsay statements by a deceased about fear of a defendant, who later advances in his or her defense in a homicide prosecution a claim that the victim's death was accidental, are admissible for the purpose of proving the declarant's state of mind under N.J.R.E. 803(c)(3). Such evidence is relevant when the door is opened by the defense, as occurred here by defendant's advancement of accident as the cause of Jody's death under unusual circumstances. Having determined that state-of-mind evidence about the victim is relevant when an accidental-death theory is advanced by defendant, we turn to assess whether the trial court abused its discretion in admitting the evidence.

IV.

A.

Evidentiary rulings made by the trial court are reviewed under an abuse-of-discretion standard. Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008). To that end, trial courts are granted broad discretion in making decisions regarding evidentiary matters, such as whether a piece of evidence is relevant, see Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999), and whether a particular hearsay statement is admissible under an appropriate exception, see State v. Buda, 195 N.J. 278, 294-95 (2008).

In pretrial argument before the trial court, the defense conceded that state-of-mind evidence "may be probative" when

30

accident is the defense and focused its attack about admissibility on the volume of statements that the State sought to introduce and the good faith of Jody's statements when made. Responding to the arguments advanced pretrial, the trial court assessed the voluntarily reduced list of witnesses from whom the State sought to elicit the state-of-mind hearsay statements of the deceased and concluded that they were relevant for the singular purpose of the jury's assessment of Jody's state of mind and how that related to the issues to be decided in this homicide case. Specifically, the court determined to allow testimony from six witnesses (although only five actually testified) about Jody's statements expressed shortly before her death and during the time when she was moving forward with her divorce action by having it filed and served on defendant. The court emphasized the statements' temporal proximity both to the actions unfolding regarding the divorce and the date of Jody's death. The court concluded that the statements were rendered close enough in time to enhance their probative value and provide a direct counter to defendant's narrative that this was all just an accidental death. Without expressing it precisely in terms of good faith, the court found the statements sufficiently reliable to put them before the jury for their assessment for that limited purpose.

31

The court was specific in what it was allowing: statements of fear of defendant; statements about defendant's abusive conduct toward her, but not specific acts; statements about her fear of heights; and statements about her intent to continue with the divorce action she initiated. On the matter of defendant's abuse, the court cautioned that it was allowing limited reference to alleged domestic violence and only for the "singular purpose" of showing Jody's state of mind. Thus, it would allow the jury to weigh those statements against defendant's counter narrative that Jody willingly went with defendant, whom she was divorcing, to an isolated and dangerous spot where she allegedly accidentally fell to her death. It bears repeating that defendant asserted that the cliffs were "their spot," that he and Jody might have reconciled and not divorced, and that amorous activities were still, at that time, possible between them.

Indeed, concerning Teague's proffered testimony that Jody told her in a therapy session that she had never gone to the cliffs with defendant and that she had recently turned down his request that she go there with him, the court noted the highly relevant nature of that evidence to paint a picture of the general relationship between defendant and Jody shortly before the events of the evening of September 20, 1992 took place. Plainly regarding that statement as intrinsic to the

32

relationship "mosaic" that both parties to the case would be presenting, the court determined to allow Jody's statements, all of which were close in time to the event of her death.[4]

Importantly, the court expressly stated that it would not permit any of the testimony to be used to prove defendant's motivation or conduct. The statements could be used to show only Jody's state of mind, and that use was deemed permissible by the court because only her words were available to speak for her about the likelihood that she acted as defendant asserted.

Based on the argument advanced pretrial, we find no error in the trial court's admissibility determination. The testimony about Jody's oral statements reflective of her state of mind was relevant because defendant opened the door to it by arguing that an accidental death occurred here. Defendant's argument pretrial did not more specifically focus on the content of Jody's out-of-court state-of-mind statements.

---

[4] We reject the argument that Teague could not testify to statements made by Jody during her counseling sessions with her because the defense asserts that the statements were not for the purpose of medical diagnosis or treatment. As the State properly argued, these statements were admissible as having been obtained as part of Teague's process of diagnosing the root causes of Jody's depressive feelings for which she was administering professional care and treatment to Jody. See N.J.R.E. 803(c)(4); see also R.S. v. Knighton, 125 N.J. 79, 88 (1991) (observing that, "when the cause of a symptom, pain, or physical sensation is relevant to diagnosis and treatment, courts will admit the statement"). We find no abuse of discretion in the trial court's admission of Teague's testimony.

33

On appeal, defendant argues that this state-of-mind evidence could not possibly assist in the important assessment of whether defendant killed with the requisite state of mind and therefore its relevance was overvalued by the trial court. We reject that argument. It is too limiting a frame for the admissibility determination we review. Whether Jody would have gone alone with defendant, willingly, anywhere, let alone to an isolated place, at night, on the cliffs, where she said she had never been and would not go when asked before, makes this evidence highly probative of her state of mind. It was relevant to disputed, material factual issues about Jody's state of mind toward defendant, about her marital relationship, and about her likely conduct that were ultimately argued in this trial where the defense was accidental death. In conclusion, we find no abuse of discretion in the court's determination not to grant defendant's motion to exclude the evidence for the reasons advanced.

## B.

Turning to how the statements were handled at trial when admitted during the presentation of the testimony, we again view those statements from the trial court's vantage point because we review the court's admission of hearsay statements under an abuse-of-discretion standard. See Buda, supra, 195 N.J. at 295 (noting that "[o]ur review of these evidentiary determinations

34

likewise is limited to determining whether the trial court's decisions . . . constituted an abuse of discretion"). Therefore, we examine the arguments, and objections, if any, when made before the trial court as the evidence was presented. See id. at 294-95.

Notably, the defense raised no objection to the admission of the statements of M.H., Teague, or M.G. There was not a single objection to the content of the testimony of those first three witnesses. Nor did counsel request or suggest any limiting instruction at the time. Instead, the defense mounted an objection to the cumulative nature of the two remaining witnesses when M.D. was about to testify (A.R. followed M.D. and was the last witness presented by the State on this subject). The court preliminarily accepted the State's argument that it was entitled to bring in testimony from the perspective of people who interacted with Jody from different parts of her life, said "let's see what they say," and informed defense counsel that it would permit further objections. No specific objection came during any point in M.D.'s testimony.

Just prior to A.R.'s testimony, counsel stated he was continuing his objection based on the cumulative nature of the testimony as was argued at sidebar, but there was no objection to any specific part of A.R.'s testimony, just as there had been none to M.D.'s testimony.

We recognize the hesitancy that a trial court might have with interjecting in this testimony when defense counsel did not object to any specific piece of the testimony by those witnesses and who was himself actively questioning the witnesses about Jody's statements on cross-examination. Concerning the cumulative-testimony general objection, we note that M.D.'s testimony took up only twelve pages and A.R.'s ten pages in the transcript. That included their direct and cross-examination. Plainly, these witnesses were the tail of this testimony and we view it from the vantage point of the trial court as the testimony unfolded. That day, the State had presented a total of five witnesses. The first two, M.H. and Teague, were by far the longest, with M.G. trailing far behind in length. Not until the short presentations of M.D. and A.R. did the court confront an objection. We will not substitute our judgment for that of the trial judge who sat through that day of testimony and reacted fairly to the parties' arguments about the remaining two witnesses. Overall, the objected-to testimony was brief, covered some different ground, and was not cumulative to the point of being erroneously admitted. We determine that there was no abuse of discretion by the trial court.

V.

On appeal, defendant advanced arguments not presented to the trial court. Defendant argued that the prejudicial content

36

of the phraseology of the utterances by Jody, as testified to by the witnesses, should have required their exclusion. According to defendant, their admission rendered the conviction reversible as a matter of plain error. Defendant also contended that the trial court's instructions to the jury on the use of the state-of-mind evidence were inadequate.

A.

Generally, arguments about the prejudicial nature of individual statements should have been made to the trial court. See State v. Robinson, 200 N.J. 1, 19 (2009) ("The jurisdiction of appellate courts rightly is bounded by the proofs and objections critically explored on the record before the trial court by the parties themselves."). An appellate court is better positioned to reviewing evidential arguments first presented to the trial court.

That said, on the merits of defendant's arguments, the statements of Jody's fear of defendant and of her fear of violence by defendant were plainly prejudicial to defendant because they conveyed unfavorable information about defendant, as perceived by Jody. There was testimony repeating numerous statements by Jody about her fear of defendant, several about her fear of violence by defendant, and even testimony that she feared that he would kill her. The quantity and quality of some of those statements give us pause. The better practice here

37

would have been for the trial court to have limited the amount and content of the state-of-mind testimony elicited through the witnesses.

But the admitted statements clearly were relevant for rebutting defendant's claim about how he and Jody were interacting at the point in time that she ended up one evening on a remote cliff on the Palisades with defendant when she was pursuing a divorce action against him and was requesting friends to let her know if he came around places she frequented looking for her. The hearsay statements were directly relevant and were of assistance to the jury in its assessment of the likelihood that Jody would have voluntarily accompanied defendant to the edge of a cliff for a romantic interlude. This was classic state-of-mind evidence used to counter an accidental-death defense to a charge of homicide. Cf. Aesoph, supra, 647 N.W.2d at 748, 755-57 (finding that state-of-mind hearsay testimony of defendant's deceased wife, who was divorcing him and had fled home, that she feared violence by defendant was admissible in rebuttal of defendant's claim of accidental death); see generally 2 McCormick on Evidence, supra, § 276 at 403-04 (stating that state-of-mind testimony is admissible to rebut defense of accident because statements rebut defendant's claims about decedent's conduct).

The evidence of the five witnesses was not an overriding part of the State's presentation. The five witnesses completed all their testimony in a single day of this long, multi-day trial. The great bulk of the State's case, presented over the many days, focused on the investigation and the forensic evidence regarding the scientific unlikelihood that Jody could have accidentally fallen forward off the cliff and landed as she did with the injuries she sustained. And, the State painstakingly brought out defendant's many inconsistent statements, including his differing versions of how the fall occurred. The jury was told by the court to use those statements only for the purpose of understanding Jody's state of mind. In reviewing the arguments of the parties, there was no suggestion made to the jury to use the evidence in any other way or for any other purpose. Moreover, the State's summation did not dwell on Jody's statements, but rather emphasized the forensic evidence and defendant's actions and his inconsistent statements. The State used the forensic evidence in summation to show the implausibility that Jody could have simply fallen from the cliff and landed where her body was found. Thus, although the testimony included repeated statements by Jody about her fear of defendant, we do not perceive the content of the evidence admitted to constitute plain error requiring reversal of this conviction.

Nor do we find plain error in the instruction provided by the court to the jury, although we have more to say about instructing the jury in these settings.  To the extent that defendant attacks the adequacy of the trial court's limiting instruction on the use of that evidence, we make the following observations.

First, the defense's few objections during the eliciting of the testimony went only to the asserted cumulative nature of the evidence.  At no point during the presentation of the witnesses did counsel propose instructing the jury at that time on the use of the testimony.

Second, it bears recalling that when the trial court ruled pretrial that the state-of-mind evidence would not be excluded, it instructed counsel to prepare and submit language to properly instruct the jury about the evidence's use.  None was forthcoming during the trial apparently.

Third, the issue of a limiting instruction finally came up during the charge conference.  The transcript of the charge conference demonstrates that the State offered proposed language on the permissible use of the state-of-mind evidence.  The defense reacted to that proposal, requesting removal of any proposed use other than to show the victim's state of mind.  After a pointed exchange between counsel, the court reserved on the question.  The charge ultimately provided was limited to

40

what the defense requested be given.  In light of the manner in which the trial court solicited input on an instruction to the jury, and engaged with counsel over a proper limiting instruction, the result here was a negotiated jury charge that we cannot say caused defendant's trial to be unjust.

B.

Having addressed the arguments raised in this matter, we would be remiss were we not to highlight our concern about dangers associated with use of state-of-mind testimony about a declarant's fear of a defendant.

Testimony about a decedent's stated fear of the defendant and, more pointedly, a decedent's stated fear of violence at the hands of the defendant, is powerful evidence.  It clearly carries prejudicial impact for the defendant but the question is whether it is unfairly prejudicial.  See N.J.R.E. 403.  For that very reason, many courts evaluating the proper use of such state-of-mind evidence have recognized that, even if the proposed testimony is admissible as relevant evidence under the state-of-mind exception to the hearsay rule, it can be subject to exclusion if its relevance is substantially outweighed by the danger of unfair prejudice.  See State v. Bauer, 598 N.W.2d 352, 367 (Minn. 1999) overruled on other grounds by, State v. McCoy, 682 N.W.2d 153, 160 n.6 (Minn. 2004); Campbell v. United States, 391 A.2d 283, 287 (D.C. App. 1978).

We share the concern of courts in sister jurisdictions about the need to take great care with such perilous evidence. Care must be taken to guard against undue prejudice and the risk that the jury may misuse the evidence.

Accordingly, to address our concern about proper use of state-of-mind hearsay evidence of a homicide victim's fear of a defendant, and especially the victim's statements of fear of violence by the defendant, we shall impose on trial courts, as gatekeepers to the admissibility of such evidence, the obligation to perform an express Rule 403 weighing of evidence in addition to an assessment for relevance of the victim's state-of-mind testimony under Rule 803(c)(3). A weighing for undue prejudice should follow a review for relevance under Rule 803(c)(3). In addition to the court's ability to exclude such evidence, the trial court should consider limiting its amount, including redacting or sanitizing it as the court determines appropriate, to balance the interests of the proponent of the testimony and that of the party against whom it is used. For example, a court might allow the jury to hear relevant evidence about the victim's "fear" of a defendant but might redact more prejudicial parts of a victim's statement that she feared death at the hands of the defendant. The latter part adds little of relevance and can be unduly prejudicial. The sheer force of the latter type of statement suggests that because the victim

42

thought the defendant would kill her, he must have done so --
which is not a permissible inference.

Further, a proper limiting instruction is necessary. "It
is the independent duty of the court to ensure that the jurors
receive accurate instructions on the law as it pertains to the
facts and issues of each case, irrespective of the particular
language suggested by either party." State v. Reddish, 181 N.J.
553, 613 (2004) (citing State v. Thompson, 59 N.J. 396, 411
(1971)). Indeed, "[i]t is difficult to overstate the importance
of jury instructions" as "[a]ppropriate and proper charges are
essential for a fair trial." Ibid. (quoting State v. Green, 86
N.J. 281, 287 (1981)); see also State v. Baum, 224 N.J. 147, 159
(2016).

A limiting instruction is required here to guard against
the risk that the jury will consider the victim's statements of
fear as evidence of the defendant's intent or actions. See
Calleia, supra, 206 N.J. at 292. Such state-of-mind testimony
may properly be used only for evaluating the victim's actions or
the likelihood of him or her acting in a certain way. Id. at
296. The evidence is relevant, as it was in this case, for
assessing the likelihood of the victim's actions when the jury
considers the defense of accidental death proffered in a
homicide prosecution. However, the evidence may not be used as
evidence of the defendant's actions or intent. Id. at 292.

Through a limiting instruction, the jury should be told the permissible and prohibited purposes of the evidence.  Cf. State v. Cofield, 127 N.J. 328, 341 (1992).

In light of those concerns, the better practice to be followed, whether requested or not, is to tailor the charge on how to use the state-of-mind evidence to the facts and to tell the jury how the evidence may be used and how it may not be used.  For example, the court here could have told the jury that the state-of-mind evidence -- Jody's fear of defendant –- was relevant to the issue of whether Jody voluntarily went to the edge of a cliff with defendant.  State-of-mind evidence bears on how Jody likely acted on the night of her death.  Ultimately, the inferences concerning how Jody's state of mind affected her conduct were for the jury to draw.  Moreover, to deflect risk that the jury might misperceive the limited use to which it may put such evidence, a limiting instruction should be provided at the time the evidence is presented, as well as at the close of the evidence when the jury charge is delivered prior to deliberations.  See State v. Winder, 200 N.J. 231, 256 (2009) (noting importance of "prompt" limiting instruction at time evidence is admitted in addition to at time of closing instruction); State v. Lykes, 192 N.J. 519, 537 (2007) (noting same).  The pointed and immediate direction to the jury as to the limited permissible use of such evidence will protect

44

defendants while underscoring for the proponent of the testimony the permissible use for which it is advanced.

VI.

The judgment of the Appellate Division is reversed. The matter is remanded for consideration of defendant's unaddressed appellate arguments.


CHIEF JUSTICE RABNER; JUSTICES ALBIN, FERNANDEZ-VINA and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE LaVECCHIA's opinion. JUSTICE PATTERSON did not participate.