**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4955-18

DALILA CZUKERBERG,
a/k/a DALILA
ROSENSTRAUCH,

     Plaintiff-Appellant/
     Cross-Respondent,

v.

STATE-OPERATED
SCHOOL DISTRICT OF THE
CITY OF NEWARK, a/k/a
NEWARK PUBLIC SCHOOLS,

     Defendant-Respondent/
     Cross-Appellant,

and

CITY OF NEWARK, STATE OF
NEW JERSEY, REGINA V.
SHARPE, individually, HENRI
FREDERIQUE, individually, and
CYNTHIA GUINN, individually,

     Defendants.

_____

Argued February 10, 2021 – Decided March 26, 2021

Before Judges Whipple, Rose and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-8847-15.

Keith N. Biebelberg argued the cause for appellant/cross-respondent (Biebelberg & Martin, attorneys; Keith N. Biebelberg, Avrin Slatkin, and Jay M. Nimaroff, on the briefs).

Brenda C. Liss and Marc D'Angiolillo argued the cause for respondent/cross-appellant (Riker Danzig Scherer Hyland & Perretti, LLP, and Brenda C. Liss, General Counsel, attorneys; Brenda C. Liss and Marc D'Angiolillo, of counsel and on the briefs; Stephanie D. Edelson, on the briefs).

PER CURIAM

Plaintiff Dalila Czukerberg appeals from the Law Division's June 27, 2019 order of judgment entered in favor of defendant State-Operated School District of the City of Newark, now known as the Newark Board of Education, following a jury trial. Defendant cross-appeals the denial of summary judgment that preceded the jury trial resulting in the verdict in its favor. We affirm.[1]

---

[1] Defendants Regina V. Sharpe, Henri Frederique, and Cynthia Guinn were voluntarily dismissed from the matter and are not participating in the appeal or cross-appeal.

A-4955-18

I.

We derive the facts from the record, including the evidence presented at trial. Plaintiff was hired by defendant in 2012 and assigned to Barringer High School for one year and then hired to teach at Dr. William Horton Elementary School (Horton) for the 2013-2014 school year, where she taught fifth grade. For the 2014-2015 school year, plaintiff was hired as a chemistry teacher at University High School (UHS) and was hired by defendant Regina V. Sharpe, the school's principal.

Plaintiff came to UHS on a "corrective action plan" because she was evaluated as a "partially effective" teacher at Horton. According to plaintiff, her partial effectiveness rating at Horton resulted from an evaluation by a non-Spanish speaking evaluator upon observing plaintiff teach a bilingual class for non-English speaking students.

A "corrective action plan" is a State-mandated "remedial action plan for a teacher that has been rated ineffective or partially ineffective on their annual evaluation the prior year." Each teacher is evaluated every year on an "evidence-based" approach based on what occurred in the classroom.

On plaintiff's first day of work at UHS, a few of her students turned in a summer assignment their prior teacher, Dr. John Loreno, gave them in June, at

3

the end of the preceding academic year. The summer assignment involved coloring in a printout of the periodic table of the elements using colored pencils. Because several students complained they did not understand Loreno's assignment, plaintiff copied and reissued the assignment to the students and gave them two weeks to complete it. Following the two-week period, more students turned in their assignment, but others did not.

Thereafter, several students and parents complained to defendant Henri Frederique, Vice Principal at UHS, about the summer assignment, plaintiff's teaching methods, and the "punitive nature of . . . her grading system." Frederique testified he regularly took contemporaneous notes of his telephone and in-person conversations with parents and, at trial, some of his notes documenting complaints were introduced into evidence.

Defendant Cynthia Guinn, another Vice Principal at UHS, was responsible for professional development of the teachers, and accompanied Frederique on several classroom observations of plaintiff. Consistent with plaintiff's corrective action plan, on September 10, 2014, Frederique and Guinn conducted a formal observation of plaintiff's teaching. They noted "a lot of arguing between the student[s] and teacher" and that plaintiff was confrontational and disrespectful to the students, with little to no learning taking place.

A-4955-18

Beginning on September 22, 2014, when plaintiff gained access to her online gradebook, she began inputting grades. Because Frederique was still receiving complaints from parents about plaintiff, he audited her gradebook and noticed that, with respect to the summer assignment, "the grades varied from [0], 50s, 70s, 100," therefore he questioned plaintiff on what rubric she used to assign those scores. Plaintiff did not provide one and told Frederique it was just a "simple assignment." Frederique informed plaintiff that Loreno had graded the summer assignment as extra credit, and she should not penalize anyone who did not complete it.

Sharpe testified that based on the nature of the parents' complaints, she thought plaintiff's scoring method violated the uniform grading policy because the summer assignment was about coloring and not mastery of any curriculum. Sharpe and Frederique testified that plaintiff agreed to a "compromise" whereby students that received passing grades would get the benefit of those grades, but grades for the students who failed would be omitted from the gradebook.

Upon later auditing plaintiff's gradebook, Frederique learned that plaintiff did not abide by her agreement and did not remove the failing summer assignment grades. Plaintiff testified she found this directive to be "very highly irregular" as she had never been asked to remove grades from her gradebook

5

A-4955-18

before.  Soon thereafter, Frederique sent plaintiff an email, which she construed as "threatening" disciplinary consequences if she did not remove the failing grades.  When she did not comply with Frederique's directive, he issued a letter of reprimand.

On October 2, 2014, Sharpe and Frederique observed plaintiff teach and rated her as partially effective.  Sharpe expressed that plaintiff's "growth areas" as outlined in her corrective action plan included the differentiation of instruction and the need to integrate technology into her lessons.  Plaintiff also needed to focus on ensuring that "learning is specific, clear, aligned to curriculum, and contains high process skills."  At trial, plaintiff testified these were "good recommendations" on how she should improve.

On October 3, 2014, Frederique audited plaintiff's gradebook, which revealed the summer assignment grades had not been removed as directed.  Further, he noticed plaintiff had given students zeroes for being disruptive in class, which he testified was inappropriate because a zero grade denies a student the opportunity to have a passing grade by the end of the year.  That day, Frederique issued plaintiff a "Letter of Reprimand for Insubordination" for not removing the failing summer assignment grades as per his directive.  In addition, Frederique advised that disciplinary consequences would follow if she refused

6

to remove the subject grades, along with an "ineffective" rating if similar behavior persisted.

Also, in October 2014, plaintiff complained to Sharpe about misbehavior by some of her students, in particular an incident in which classroom equipment was destroyed. Sharpe suggested that another adult be in the classroom, an invitation plaintiff "welcomed." In response, Sharpe placed Ramel Watson, a substitute teacher and basketball coach, in plaintiff's classroom for all five of her chemistry classes, to assist her with "classroom management."

Watson testified that during his time assisting in plaintiff's classroom, he witnessed students physically threaten her. And, Watson also saw plaintiff provoke or be rude to the students. The same students who had behavioral issues in plaintiff's classes behaved better in other classes according to Watson. By the end of October 2014, Sharpe contemplated terminating plaintiff and replacing her with another teacher. In an October 28, 2014 email to Brad Haggerty, the Superintendent, and the Human Resources Department, Frederique recommended that plaintiff be placed on a thirty-day performance improvement plan. Haggerty testified that a thirty-day plan is "like a final warning" to a teacher. The plan was implemented a month later.

A-4955-18

On November 13, 2014, Frederique and Guinn observed plaintiff's classroom again. Plaintiff was evaluated as ineffective; not meeting the requirements of her corrective action plan; and not making progress on improving student learning evidenced by the sixty-seven percent failure rate amongst her students. Frederique found this percentage to be "extremely high"—some students who were failing plaintiff's class were getting As and Bs in other classes.

On November 14, 2014, plaintiff submitted electronic copies of her end-of-marking-period grades to Sharpe and Frederique. Plaintiff derived these grades utilizing defendant's uniform grading policy manual, which included an appeal process for parents seeking to challenge their child's grade.

On November 20, 2014, plaintiff was summoned to Sharpe's office for a meeting at which she and Frederique were present. Sharpe testified that she heard plaintiff refused to administer tests to students who were late and locked them out of the classroom. When Sharpe confronted plaintiff about this, plaintiff responded that she should have the authority to refuse to allow students entry into her classroom. Sharpe also informed plaintiff that the grades she submitted for the marking period violated defendant's uniform grading policy.

Plaintiff testified that Sharpe told her "something had to be done with the grades" and ninety-eight percent of her students were failing, a number plaintiff claimed was inaccurate. In her own testimony, Sharpe stated plaintiff's failure rate in the class was sixty-eight percent, a number Sharpe had never encountered before.

Sharpe determined that plaintiff was not meeting the requirements of her corrective action plan. After consulting with Haggerty, Sharpe put a hold on the grades for plaintiff's students pending an investigation and considered the hiring a replacement for plaintiff at that time.

On November 2, 2014, following a meeting between plaintiff, Frederique, and a parent of one of plaintiff's students, Frederique admonished plaintiff by email for her reprehensible conduct towards the parent, describing it as "rude and unprofessional." He warned plaintiff of "disciplinary action" if "further unprofessional conduct occurred."

On December 2, 2014, Sharpe delivered to plaintiff the thirty-day plan previously proposed in October. Haggerty authorized the plan and knew plaintiff might have to be terminated and replaced. The plan included strategies for plaintiff's improvement, which Sharpe devised in consultation with Frederique and Guinn. The plan stated that plaintiff's performance was

"unsatisfactory in several respects," including the amount of failures in the gradebook. Sharpe added plaintiff's "grading practices do not reflect sound pedagogy as evidenced by the high failure rate" and listed other problems. The plan set forth performance improvement goals, one of which was to "devise a fair and equitable grading policy." Plaintiff was warned that failure to improve would result in her termination within thirty days.

Three days later on December 5, 2014, plaintiff received the report cards for her homeroom students. On each report card, there was a blank space for chemistry where the grade would ordinarily be. Plaintiff was not informed that UHS would be issuing report cards with blank grades.

On December 9, 2014, plaintiff emailed a memo to Haggerty, Sharpe, and Frederique challenging the claims about her failure rate and arguing that her grades were accurate and precise. Plaintiff believed a twenty-percent failure rate was "acceptable" and that by the end of the year, a similar rate would hold for her students. Plaintiff also queried in her memo what message eliminating her grades from report cards would send to the students, adding that she understood "the administration has the right to do so, but that does not make it right," because she had "worked so hard" and wanted the students to view her as "credible."

10

On December 12, 2014, Sharpe and Frederique conducted another observation of plaintiff. In the evaluation form submitted thereafter, they gave plaintiff "ineffective" ratings in fourteen out of fifteen metrics. At trial, Sharpe testified "[t]he lesson was awful," the "students weren't learning," and "[t]here was arguing back-and-forth pretty much for the entire class period between [plaintiff] and the students." Frederique testified in a similar vein and opined that plaintiff's teaching skills had worsened since her October evaluation. He recommended to Sharpe that plaintiff be terminated because she had shown no improvement despite multiple opportunities. After Sharpe explained the reasons for her "ineffective" rating, plaintiff was "defensive" and "argumentative."

Sharpe and Frederique recommended to Haggerty that plaintiff be terminated because "the students were not learning chemistry," the classroom was a "combative environment," and parents were complaining. On December 15, 2014, UHS issued report cards for plaintiff's chemistry students. Immediately, plaintiff saw the grades had been changed from those she submitted. She was "in shock" and told her students when handing out the report cards that the grades were not what they "earned." Plaintiff testified she felt "violated" and believed the administration transgressed the law by "tampering

11

with official documents." She also believed that "fake grades" were a disservice to parents and against public policy since colleges review high school grades.

Frederique testified that the administration was under no obligation "to inform" plaintiff about the grade adjustment, and a curve was placed on the grades due to the "sheer number of failures in the classroom." Sharpe determined that the fairest way to curve the grades would be to elevate each grade by one-half grade. At Sharpe's direction, Frederique changed each student's grade by hand. The grade adjustment was not made to make the school "look better" to the State, Frederique testified, but only as a response to plaintiff's ineffective teaching and punitive grading. He acknowledged that some students' grades were elevated by more than one-half a grade.

After seeing the report cards, plaintiff sent several emails complaining about the situation to the administration and requested a meeting with Haggerty. He testified that he viewed plaintiff's emails to him as an attempt to go above administrators at UHS and get someone to intervene on her behalf. No meeting ever took place. On December 17, 2014, plaintiff emailed Haggerty, Sharpe, Frederique, and Guinn with the subject line, "Tampering with My Records," and documented her timeline of events.

A-4955-18

On December 29, 2014, plaintiff received a letter from defendant terminating her employment. The decision was ultimately made by Haggerty, on advice from Frederique and Sharpe. Haggerty claimed the decision was "relatively straightforward" and that he made it prior to receiving plaintiff's emails to him complaining about the grades. He testified, "there was no conspiracy to elevate the grades to get Newark out from under State control." Frederique confirmed his recommendation to terminate plaintiff was not because she had complained, but because "she simply was not a good teacher," and he "had to salvage the rest of the year" for the students.

In December 2015, plaintiff filed an eight-count complaint against defendants Newark Public Schools, City of Newark, State of New Jersey, Sharpe, Frederique, and Guinn alleging violations of the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-3, (count one); wrongful termination (count two); intentional infliction of emotional distress (count three); negligent infliction of emotional distress (count four); breach of the implied covenant of good faith and fair dealing (count five); defamation (count

13

six); slander (count seven); and a violation of her First Amendment rights under the United States and New Jersey Constitutions (count eight).[2]

Following a period of discovery, on January 10, 2017, defendants, the District, Sharpe, Frederique, and Guinn moved for summary judgment. Plaintiff opposed the motion.

On March 17, 2017, the prior judge granted defendants' motion for summary judgment on five of the eight counts of the complaint but denied summary judgment on three counts: the first count, alleging a CEPA violation; the second, alleging wrongful termination; and the fifth, claiming violations of the implied covenant of good faith and fair dealing.[3]

On January 5, 2018, defendants moved a second time for summary judgment, which was opposed by plaintiff. Oral argument was conducted on February 21, 2018. On March 1, 2018, plaintiff filed an amended complaint, identical to the original, except that "State-Operated School District of Newark" (the District) was substituted as the party name for the defendant previously

---

[2] Defendants City of Newark and the State of New Jersey were dismissed early on in the litigation.

[3] The record does not indicate whether oral argument was held on defendants' motion, and the judge's opinion was not provided.

designated as "Newark Public Schools."[4]  On March 16, 2018, in an oral decision, the different judge granted defendants' motion for summary judgment on counts two (wrongful termination) and five (breach of the implied covenant of good faith and fair dealing) but denied summary judgment on count one—the CEPA claim, the only remaining count.

The judge found that plaintiff presented evidence of a genuine issue of material fact as to "whether [she] had a reasonable belief defendant was violating a law, rule, regulation, or public policy."  Defendants moved for reconsideration on count one, suggesting the judge needed to identify a specific statute which plaintiff believed had been violated.  On March 16, 2018, the motion judge affirmed her prior decision and highlighted that N.J.S.A. 2C:21-4[5] was the statute at issue.

---

[4]  On March 14, 2018, plaintiff and defendants stipulated to the dismissal of the State of New Jersey as a defendant.

[5]  N.J.S.A. 2C:21-4 provides for "Falsifying or tampering with records." Subsection (a) states:

> Except as provided in subsection b. of his section, a person commits a crime of the fourth degree if he falsifies, destroys, removes, conceals any writing or record, or utters any writing or record knowing that it contains a false statement or information, with purpose to deceive or injure anyone or to conceal any wrongdoing.

A-4955-18

Prior to trial, defendants moved in limine to exclude the entirety of plaintiff's proposed expert witnesses: the videotaped de bene esse testimony of her employability expert, Dr. Albert R. Griffith, and the de bene esse testimony of her educational expert, Dr. James A. Monk. The trial court judge granted the motion as to Griffith and granted the motion in part as to Monk, directing that only portions of his recorded testimony would be played for the jury.

On May 9, 2019, the trial judge denied plaintiff's motion for reconsideration of the order barring Griffith's testimony and limiting Monk's testimony. The same day, the trial judge granted defendants' motions to exclude at trial: notes taken by Watson and articles and statutes from other states that assess penalties for altering grades.

On June 13, 2019, after both sides rested, the judge, with plaintiff's consent, dismissed all counts as to the individually named defendants leaving the District as the sole remaining defendant. The following day, the jury returned its verdict. The first question on the verdict sheet asked whether plaintiff had proven by a preponderance of the evidence "that she reasonably believed that [d]efendant Newark Board of Education had changed her grades and that this was in violation of a law, rule, or a clear mandate of public policy." The jury unanimously answered "yes" to that question.

16

The second question asked whether plaintiff had proven by a preponderance of the evidence "that she performed a 'whistleblowing activity' as a result of her objection to the grade alterations." By a six-to-one vote, the jury answered "no." On June 27, 2019, the judge entered judgment for the District and dismissed the amended complaint with prejudice. On July 12, 2019, the judge denied plaintiff's motion for a new trial on the grounds that the jury verdict was against the weight of the evidence. This appeal and cross-appeal ensued.

On appeal, plaintiff raises fifteen points:

> (1) the trial judge erred by instructing the jury that plaintiff's complaints about the summer assignment and the subsequent letter of reprimand were not part of her CEPA claim;
>
> (2) the motion and trial judges erred by excluding the de bene esse trial testimony of plaintiff's employability expert by incorrectly concluding that his report was a net opinion;
>
> (3) the motion and trial judges erred by excluding a portion of the de bene esse testimony of plaintiff's educational expert;
>
> (4) the trial judge erred by barring plaintiff from countering the District's pretextual claim that "there was no learning going on in her classroom" and not allowing her to introduce students' letters to Al Roker comparing the British system to the metric system;

(5) the trial judge erred by permitting the District's employability expert to testify;

(6) the trial judge erred by excluding the handwritten notes taken by Watson, the substitute teacher;

(7) the trial judge erred by allowing the District to introduce into evidence the written evaluations of plaintiff prepared by Sharpe, Guinn, and Frederique;

(8) the trial judge erred by admitting hearsay statements made by several of plaintiff's students and their parents;

(9) the trial judge erred by disallowing evidence that plaintiff was previously rated an effective teacher at Barringer High School;

(10) the trial judge erred by excluding evidence that plaintiff had been rated an effective teacher at various school districts throughout her career;

(11) the trial judge erred by excluding and preventing plaintiff's counsel from quoting from a series of emails concerning the summer assignment;

(12) the trial judge erred by excluding evidence of grading scandals in other school districts and record-keeping statutes from other states;

(13) the trial judge erred by dismissing her punitive damages claim;

(14) the cumulative effect of errors prejudiced plaintiff and deprived her of a fair trial; and

(15) if a new trial is granted, the jury's answer to question one on the verdict sheet should be given preclusive effect at the next trial.

In its cross-appeal, the District argues the motion judge erred by denying its motion for summary judgment on plaintiff's CEPA claim.

II.

CEPA—via the various terms of N.J.S.A. 34:19-3—prohibits an employer from taking "any retaliatory action" against an employee in certain circumstances. One of those is when the employee "[d]iscloses or threatens to disclose to a supervisor or a public body" an employer's "activity, policy or practice" that the employee "reasonably believes":

> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . .; or
>
> (2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation . . . .
>
> [N.J.S.A. 34:19-3(a).]

CEPA also permits recovery for retaliation when, as described in subsection (c) of N.J.S.A. 34:19-3, an employee "[o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes" fits any one of three circumstances. The first two, which appear in subparts (1) and (2) of N.J.S.A. 34:19-3(c), are identical to subsection (a)'s first two subparts; the third is when the employee objects or refuses to participate in

19

an activity, policy or practice that the employee reasonably believes "is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment." N.J.S.A. 34:19-3(c)(3).

In determining what constitutes a prima facie case, our Court has recognized not only the employee's "reasonabl[e] belie[f]" about the employer's violation of law, rule, regulation or clear policy, but also that there must be shown "an adverse employment action" and a "causal connection" between the whistleblowing and the adverse employment action. Yurick v. State, 184 N.J. 70, 78 (2005).

CEPA is a remedial statute and should be liberally construed to effectuate its social goal of protecting employees from retaliation when they report workplace misconduct. Lippman v. Ethicon, Inc., 432 N.J. Super. 378, 380 (App. Div. 2013). Our Court has emphasized that the CEPA plaintiff need not show the employer actually violated the law, only that the plaintiff reasonably believed the employer was violating a law or a clear mandate of public policy. Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003). In interpreting the "reasonable belief" element, we recognize that CEPA was not intended to "make lawyers out of conscientious employees." FOP v. City of Camden, 842 F.3d 231, 240 (3d Cir. 2016).

To sustain a claim pursuant to N.J.S.A. 34:19-3(c)(3)—CEPA'S protection from retaliation for objecting to a practice that is incompatible with a "clear mandate of public policy"—a plaintiff must prove: a reasonable belief of actions incompatible with a clear mandate of public policy; an act of whistleblowing; adverse employment action was taken against the employee; and a causal connection between the whistleblowing activity and the adverse employment action. Hitesman v. Bridgeway, Inc., 218 N.J. 8, 29 (2014). To establish a practice is incompatible with a clear mandate of public policy, the plaintiff must identify an "authority that provides a standard against which the conduct of the defendant may be measured." Id. at 33. In Hitesman, the Court declared, as it had ten years earlier in Maw v. Advanced Clinical Commc'ns. Inc., 179 N.J. 439, 444 (2004), that a "clear mandate of public policy" conveys

> a legislative preference for a readily discernible course of action that is recognized to be in the public interest. A "clear mandate" of public policy suggests an analog to a constitutional provision, statute, and rule or regulation promulgated pursuant to law such that, under [CEPA], there should be a high degree of public certitude in respect of acceptable vers[u]s unacceptable conduct.
>
> [218 N.J. at 34 (citing Maw, 179 N.J. at 144).]

When a plaintiff asserts a subsection (c)(3) claim, the trial judge must determine—before sending the matter to the jury—whether there is a substantial

21

nexus between the complained-of conduct and a clear mandate of public policy. Id. at 31. By complying with the requirement to establish each element of a CEPA claim, courts distinguish an employee's objection to or reporting of an employer's illegal or unethical conduct from a routine dispute in the workplace regarding the relative merits of internal policies and procedures. Ibid.

In her first point, plaintiff argues that the trial judge improperly charged the jury not to consider her complaints about the summer assignment and the subsequent letter of reprimand she received as part of her CEPA claim. "An essential ingredient of a fair trial is that a jury receive adequate and understandable instructions." State v. Afanador, 151 N.J. 41, 54 (1997). Accord State v. McKinney, 223 N.J. 475, 495 (2015). Instructions provide "a road map to guide the jury [and] without an appropriate charge a jury can take a wrong turn in its deliberations." Ibid. (quoting State v. Martin, 119 N.J. 2, 15 (1990)). "The trial court has clear directives with regard to what must be included in the charge." McKinney, 223 N.J. at 495 (quoting State v. Martin, 119 N.J. 2, 15 (1990)). The court "should explain to the jury in an understandable fashion its function in relation to the legal issues involved," and should also explain what "the jury must determine." Ibid. (quoting State v. Green, 86 N.J. 281, 287 (1981)). "So critical is the need for accuracy that erroneous instructions on

material points are presumed to be reversible error."  Martin, 119 N.J. at 15.

Accord McKinney, 223 N.J. at 495-96.

In the matter under review, plaintiff's challenge to the jury instructions pertains to her burden of proof under CEPA, which establishes as a violation the taking of "any retaliatory action against an employee because the employee does" any of several things, including: "[o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes: (1) is in violation of a law, or a rule or regulation . . . (2) is fraudulent or criminal . . . or (3) is incompatible with a clear mandate of public policy."  N.J.S.A. 34:19-3(c).

> A plaintiff who brings a cause of action pursuant to N.J.S.A. 34:19-3(c) must demonstrate that: (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle[]blowing" activity described in N.J.S.A. 34:19-3(c); (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle[]blowing activity and the adverse employment action.
>
> [Dzwonar, 177 N.J. at 462.]

Before a CEPA claim reaches a jury, however, a trial court must first "identify a statute, regulation, rule, or public policy that closely relates to the

complained-of conduct," and find "a substantial nexus between the complained-of conduct and a law or public policy identified." Id. at 463-64. When a "clear mandate of public policy" has allegedly been violated, as opposed to a law or regulation, the mandate must relate to "the public health, safety or welfare or protection of the environment." Id. at 469. "[T]he mandate of public policy must be 'clearly identified and firmly grounded' and cannot be 'vague, controversial, unsettled [or] otherwise problematic.'" Hitesman, 218 N.J. at 34 (second alteration in original) (quoting Mehlman v. Mobile Oil Corp., 153 N.J. 163, 181 (1998)).

If a plaintiff does not make a prima facie showing on which a court could make such findings, the court "should enter judgment for a defendant." Dzwonar, 177 N.J. at 463. If a court does determine the existence of a substantial nexus between a defendant's conduct and an identified law or public policy, "the jury then must determine whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable." Id. at 464. "[A] plaintiff's claim may survive when that plaintiff is mistaken as to whether the activity complained of actually occurred, but will not survive when that alleged activity does not violate the law or public policy." Ibid.

24

When a CEPA claim is submitted to a jury, "it is incumbent upon the court to identify the protected activity precisely, that is, to articulate the complaint that plaintiff made that constitutes whistle[]blowing." Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 561 (2013). "[T]rial courts must be vigilant in identifying the essential complaint made by the employee in order that the jury will be able to test it against the standards that the law imposes as a prerequisite to recovery." Id. at 559-60. "Vague and conclusory complaints, complaints about trivial or minor matters, or generalized workplace unhappiness are not the sort of things that the Legislature intended to be protected by CEPA." Id. at 559. "[T]he parties and the court need to have a common understanding of the legal principle that the CEPA plaintiff reasonably believed was being violated," which then "enables a true joinder of issues on the CEPA claim." Chiofalo v. State, 238 N.J. 527, 544 (2019).

The claim should be "tested against what plaintiff knew and reasonably believed, not upon what actually was or was not happening." Battaglia, 214 N.J. at 562. The preferred practice is "the statutory or other basis for claiming objected-to behavior is criminal or fraudulent" must "[o]rdinarily . . . be identified" by the court "with enough specificity to allow the court to connect the facts to the reasonableness of the perception." Chiofalo, 238 N.J. at 544.

Employees are not expected "to be lawyers on the spot," but they should, "with the assistance of counsel or careful examination by the court," be able to identify "the legal underpinnings for claimed behavior that is perceived as criminal or fraudulent." Id. at 544-45.

Here, the trial judge properly instructed the jury on the four elements plaintiff must prove to prevail on a CEPA claim, as outlined above, charging the jury that plaintiff's allegation was "that she was terminated from her employment by the [d]efendant contrary to law for objecting to the change by [d]efendant of grades . . . in December of 2014 as retaliation after she complained to the assistant superintendent that her end-of-the-marking-period grades had been changed by the administration."

Before trial, defendants had moved in limine to preclude plaintiff from addressing the issue of the summer assignment grades and the subsequent letter of reprimand as part of her CEPA claim. The trial judge granted the motion, ruling that while there was "absolutely no doubt . . . that the letter of reprimand was an adverse employment action," plaintiff had not shown she had performed any act of whistleblowing prior to Frederique's dissemination of the letter. The judge reasoned that "[m]erely complaining" when "your employer does something that affects you" was not "whistleblowing conduct." Indeed, the

judge ordered plaintiff not to suggest to the jury in her opening statement that defendant's order for plaintiff to remove summer assignment grades from her gradebook and subsequent letter of reprimand were components of her CEPA claim.

This issue reemerged at least three more times during the trial. First, during a sidebar colloquy that followed opening arguments, the judge revisited the subject of "the relevance of admissibility of any testimony with regard to the summer assignment." To be sure, the judge noted that he had already decided that the summer assignment and letter of reprimand sequence of events were not part of any continuous act of whistleblowing. Defendant's counsel asked the judge to consider instructing the jury that while "the claim under the whistleblower law pertains to the events of December and the termination," the purpose of the evidence about "the summer assignment issue" was so the jury could "hear about the background" or "context of the matter." The judge declined to give that instruction but ruled that plaintiff would be able to adduce testimony concerning the request to remove the summer assignment grades and the letter of reprimand because these events were "relevant to the plaintiff's reasonable belief or lack thereof that there was a violation of public policy."

The evidence went to plaintiff's "state of mind" and "reasonable belief that

 A-4955-18

the act that occurred in December . . . show[ed] a pattern" and was relevant to show "a continuing act of a violation of public policy." The judge added it could also be relevant to why the District terminated plaintiff or "when [it] had reached that conclusion . . . before the events that allegedly constitute[d] the CEPA violation."

Next, in response to a cross-examination question to Dr. Yolanda Mendez, the Executive Director of Human Resource Services for the Newark School District, about the summer assignment, to which the District objected, the judge noted at sidebar that he was only allowing "limited testimony surrounding the summer assignment" and advised plaintiff "you can't make this case about the summer assignment." Later that afternoon, at the charge conference, the judge determined that plaintiff could not argue in her closing argument "that the whistleblowing occurred at the time of the summer assignment controversy," relying on the reasoning of his earlier decision as to the lack of any whistleblowing activity prior to the issuance of the letter of reprimand.

In the final jury charges, when considering the second element of a CEPA claim under Dzwonar, 177 N.J. at 462, the judge instructed:

> You've heard some testimony about a summer assignment and a letter of reprimand. I'm instructing you that the summer assignment and any letter of reprimand received as a result of the circumstances

surrounding the summer assignment are not part of the [p]laintiff's CEPA claim. Merely complaining about an adverse employment action or merely complaining every time an employer does something that affects the employee or that the employee does not like . . . is not whistleblowing conduct. The summer assignment and letter of reprimand are not whistleblowing conduct.

From there, the judge went on to describe the third element, pertaining to retaliatory action, and the fourth, pertaining to plaintiff's burden of establishing "the existence of a causal connection between her alleged protected activity and the alleged retaliation . . . through her midyear termination." "In other words," the judge explained, "it's the [p]laintiff's burden to prove that it was more likely than not that the [d]efendant engaged in intentional retaliation against her because [p]laintiff objected to the grade change." The judge added that plaintiff was allowed to satisfy this burden with circumstantial evidence, including the timing of her termination and "whether [d]efendant's behavior towards the [p]laintiff changed for the worse after [d]efendant became aware of plaintiff's alleged objection."

The judge continued:

If the [d]efendant did in fact end the [p]laintiff's employment . . . because she objected to what she believed was an illegal act or violation of public policy by the [d]efendant in changing student grades from those she issued and attributed them to her, and the [p]laintiff reasonably believed the grade change was

not reasonable and was contrary to the best interests of the students as a whole and/or was otherwise illegal for—or a violation of public policy the adverse employment action, the termination, would be unlawful and in violation of [CEPA].

Plaintiff argues that the judge erred by instructing the jury not to consider whether the letter of reprimand was part of her CEPA claim. She contends that by giving that instruction, the judge misapplied N.J.S.A. 34:19-3(c), which protects her as an employee who "object[ed] to, or refuse[d] to participate in any activity policy or practice," which she reasonably believed to be either "in violation of a law, or a rule or regulation," or "fraudulent . . . criminal . . . or . . . incompatible with a clear mandate of public policy." In plaintiff's view, she "objected to or refused to participate in" changing her grades as early as September 2014 in the course of her email exchange with Frederique about the summer assignment that culminated in the letter of reprimand, an adverse employment action. Plaintiff had objected, she claims, to a continuous pattern of conduct she reasonably believed violated the law or public policy. According to plaintiff, it "contaminated the timeline," to exclude the summer assignment issue from the jury's consideration.

Plaintiff testified that she objected to and refused to adhere to Frederique's directive to remove the summer assignment grades from her gradebook, which

satisfies the second element of a CEPA claim on its face.  Dzwonar, 177 N.J. at 462.  The letter was an adverse employment action that was causally connected to her objection, which satisfies the third and fourth elements.  But the record lacks support for the first CEPA element, that plaintiff held an objectively reasonable belief that removing the summer assignment grades was illegal or contrary to public policy.  Plaintiff testified that she found Frederique's directive "very highly irregular," but failed to testify she considered the request to remove the summer assignment grades in and of itself to be illegal, criminal, or contrary to the public health, safety, welfare, or the environment, nor do the surrounding circumstances imply that she believed that at the time.

Here, plaintiff has not identified any law that Frederique's directing her to remove the summer assignment grades violated.  And, the trial judge correctly found plaintiff did not identify any "clear mandate of public policy" concerning "public health, safety or welfare or protection of the environment," Dzwonar, 177 N.J. at 469, that Frederique violated by asking plaintiff to omit grades from one assignment originally given by another teacher as extra credit.  Moreover, plaintiff did not proffer any evidence that contradicted Frederique's testimony that she did not provide him with a rubric for the grading method implemented.

A-4955-18

In its gatekeeper role, the trial court has the authority to exclude relevant evidence "if its probative value is substantially outweighed by the risk of," among other things, "confusion of issues." N.J.R.E. 403(a). As already noted, although the trial judge did not exclude testimony about the summer assignment and letter of reprimand altogether, he providently directed the jury not to consider the evidence as whistleblowing activity in order to avoid confusion of the issues. Absent a limiting instruction, there was a risk the jury might have found plaintiff's refusal to remove the grades from her assignment book was whistleblowing activity under the second element, even though the underlying employer activity objected to did not satisfy the first element.

We conclude that by removing the summer assignment issue from the jury's consideration, the judge properly narrowed the jury's focus, creating a "true joinder of issues," Chiofalo, 238 N.J. at 544, in respect of plaintiff's essential CEPA claim—that she was terminated for objecting to the administration's alteration of her report card grades, which she reasonably believed to be a violation of law or a clear mandate of public policy.

Accordingly, we see no reason to disturb the trial court's jury instruction with respect to the second element that "the summer assignment and letter of reprimand [were] not whistleblowing conduct." The evidence was necessary to

assist the jury as the finders of fact to identify the complained-of conduct that formed the basis of plaintiff's whistleblowing claim. Therefore, we reject plaintiff's contention on this issue.

### III.

Plaintiff also argues the motion judge abused her discretion by excluding the entire de bene esse trial testimony of her employability expert, Griffith, prior to trial. A witness may testify as an expert if "qualified . . . by knowledge, skill, experience, training, or education" to offer the opinion as long as the expert's "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." N.J.R.E. 702. Under Rule 703, an expert opinion must be based on "facts or data." N.J.R.E. 703. "The corollary of that rule is the net opinion rule, which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." State v. Townsend, 186 N.J. 473, 494 (2006).

"Charged with determining whether to admit expert testimony, the trial court is responsible for advancing the truth-seeking function of our system of justice . . . ." In re Accutane Litig., 234 N.J. 340, 389 (2018). To be admissible, expert testimony must satisfy three requirements: "(1) the intended testimony must concern a subject matter . . . beyond the ken of the average juror; (2) the

field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise." State v. Kelly, 97 N.J. 178, 208 (1984). Accord Accutane, 234 N.J. at 349.

With respect to expertise, the third factor, "an expert witness must possess the minimal technical training and knowledge essential to the expression of a meaningful and reliable opinion" in the area to be testified to. State v. Frost, 242 N.J. Super. 601, 615 (App. Div. 1990). The "expert must demonstrate the validity of his or her reasoning." Accutane, 234 N.J. at 392.

The record shows Griffith, a psychologist with a doctorate in education, had no firsthand experience or involvement in the field of education. He spoke to two New York search firms, a New York City principal, two New Jersey school employees, and interviewed "friends." Based on these interviews, Griffith opined that if plaintiff had not been terminated, she would have found a compatible position after leaving UHS and would have gone on to become a lead science teacher and later a principal.

The motion judge excluded Griffith's testimony, noting his lack of experience in the field of education. On its face, the report on which Griffith's testimony was based "provide[d] no explanation for any of his conclusions," and failed to "mention . . . any reference materials relied upon to assist in making

conclusions or any articulated reason as to how the individuals he chose to interview were selected [except] for the fact that they were people he knew." Griffith did not specify "the factual bases or the logical or scientific rationale that must support expert opinions," and did not establish either the reliability of the New York companies he contacted or his qualifications, as a psychologist, to testify as an expert with respect to plaintiff's teaching capacity.

"Evidentiary rulings made by the trial court are reviewed under an abuse-of-discretion standard." State v. Scharf, 225 N.J. 547, 572 (2016). "To that end, trial courts are granted broad discretion in making decisions regarding evidentiary matters . . . ." Ibid. We "will reverse an evidentiary ruling only if it 'was so wide of the mark that a manifest denial of justice resulted.'" State v. Mauti, 448 N.J. Super. 275, 307 (App. Div. 2017) (quoting Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016)).

Along those same lines, "[t]he qualifications of an expert and the admissibility of opinion or similar expert testimony are matters left to the discretion of the trial court." State v. McGuire, 419 N.J. Super. 88, 123 (App. Div. 2011). Particularly when there has been a full hearing under Rule 104(a), reviewing courts "must apply an abuse of discretion standard to a trial court's determination . . . to exclude expert testimony on unreliability grounds."

A-4955-18

Accutane, 234 N.J. at 391.

Here, plaintiff contends the motion judge abused her discretion by excluding Griffith's testimony as an inadmissible net opinion where the testimony was based on "voluminous materials," including recommendations of plaintiff, her job search applications, and "multiple evaluations of plaintiff's teaching" over the course of fifteen years. Based on these materials, Griffith formed "a working hypothesis" that plaintiff's termination "was almost certainly the destruction of her teaching career," a hypothesis he tested by contacting the individuals he consulted for the report, who "confirmed" it.

The District posits that because the excluded testimony concerning plaintiff's employability relates only to the issue of damages—an issue the jury never reached—the issue is moot. We agree with the District's argument that plaintiff's failure to establish that she engaged in whistleblowing activity, by a preponderance of the evidence, renders the admissibility of Griffith's testimony moot. The testimony only addressed the issue of damages and could not have affected the verdict as to the purported CEPA violation itself, a prerequisite to assessing damages. See Boryszewski v. Burke, 380 N.J. Super. 361, 404 (App. Div. 2005) (declining to address purported errors that occurred during retrial where restoration of a verdict from the first trial rendered the issue moot).

36

Moreover, we discern no abuse of discretion given the substantial deference we owe to the trial court's gatekeeper role with respect to expert testimony, State v. Jenewicz, 193 N.J. 440, 455 (2008), contrary to plaintiff's assertions. Griffith lacked expertise as a psychologist to opine as to plaintiff's teaching capacity and his methodology was devoid of scientific reliability. Following our review, we cannot conclude the motion judge abused her discretion in barring Griffith's testimony.

Further, plaintiff argues the motion judge abused her discretion by excluding portions of the de bene esse trial testimony of Monk, plaintiff's employability expert, and that the trial court abused its discretion by denying plaintiff's motion to reconsider that ruling. Again, we disagree.

In his report, Monk, who has twenty-five years' experience as an educational consultant and managing director of a school safety and security firm that served school districts nationwide, gave opinions on four subject areas: (1) whether defendant's practices regarding students' grades "were lawful and ethical"; (2) whether defendant's criticism of plaintiff was "valid"; (3) "whether her termination can be explained by alleged deficiencies in her teaching"; and (4) "whether proper protocol was followed in the case where plaintiff claims retaliation in response to her whistleblowing."

The motion judge ruled that Monk's decades of experience as an educational professional qualified him to testify as to "whether the [l]etter of [r]eprimand and mid-year termination affected [p]laintiff's chances of obtaining future teaching positions," which the judge held would be helpful to the trier of fact under Rule 702. The judge also determined that because Monk was "barred from offering any testimony as to [a] conclusion of law," the portion of his de bene esse testimony concerning "whether defendant'[s] practices regarding students' grades in this matter were lawful and ethical" should be excluded. Consequently, the judge excluded Monk's opinions concerning the applicability of New Jersey tenure law, professional standards for teachers, and the criminal code to this case on the grounds that these were legal issues, which are the province of the judge, not expert testimony.

Plaintiff concedes the accurate statement of the law falls within the province of the court. Courts do not generally permit experts to testify as to the state of the law in the forum. See, e.g., Ptaszynski v. Atl. Health Sys., 440 N.J. Super. 24, 37 (App. Div. 2015) (noting that "expert opinion testimony on matters of domestic law is not admissible," because the "judge has the exclusive responsibility to instruct the jury on the law to be applied"). Nevertheless, plaintiff contends that the motion judge abused her discretion by excluding

Monk's testimony as to whether defendant's grade alteration practice violated the law, "not for the conclusion that defendant's conduct was unlawful, but to show that plaintiff's asserted belief about its unlawfulness was reasonable."

We conclude plaintiff's challenge to the limited admissibility of Monk's testimony is unfounded and unsupported. First, even assuming the judge erred by failing to admit the excluded portion of Monk's testimony as evidence of plaintiff's reasonable belief in the unlawfulness of defendant's conduct, the jury unanimously found that plaintiff reasonably believed defendant's conduct violated the law or public policy. Since the jury reached this verdict on the first CEPA element without the benefit of Monk's testimony presents no logical basis to invalidate the verdict that flowed from that allegedly improper exclusion. Had the evidence been admitted, it would only have bolstered a verdict the jury already reached on count one. Moreover, plaintiff has not alleged that the excluded portion of Monk's testimony had any effect on the jury's finding as to the second CEPA element—that plaintiff did not "perform[ ] a 'whistleblowing' activity as a result of her objecting to the grade changing." Therefore, even assuming the judge erred, the error was harmless. See State v. Lane, 288 N.J. Super. 1, 7 (App. Div. 1995) ("Any error is harmless unless there is reasonable doubt that the error contributed to the verdict.").

A-4955-18

Second, to the extent that Monk's underlying opinion as to the reasonableness of plaintiff's beliefs about the law would constitute expert testimony, such testimony would exceed the permissible bounds of expert testimony and invade the province of the jury. See Nesmith v. Walsh Trucking Co., 247 N.J. Super. 360, 372 (App. Div. 1989) (Shebell, J., dissenting) (finding, in a negligence case, that expert testimony concerning what individuals involved in accident could have or should have done to avoid it improperly "invaded the province of the jury"), rev'd on dissent, 123 N.J. 547 (1991). We are not persuaded reversible error is present.

IV.

In her fourth point, plaintiff argues that the trial judge erred by precluding her from introducing her students' letters to Al Roker. Because the letters contained inadmissible hearsay, we reject plaintiff's claim.

Plaintiff attempted to admit photocopies of letters that her students had purportedly written to Roker, explaining the importance of the United States changing from the British system of measurement to the metric system. The exhibits were proffered not for their truth, but "as rebuttal to the claim that there was no student learning going on" in the classroom. The trial judge excluded the photocopies, on the grounds they were hearsay. However, plaintiff was

40

permitted to testify that she forwarded letters from her students to Roker about the metric system issue and she was proud of their work, some of which she described as "outstanding."

Plaintiff maintains that the trial judge erred by failing to ascertain that her exhibits were offered to counter defendant's "pretextual narrative" that "there was no learning going on" in plaintiff's classroom rather than for the truth of whether the United States should switch to the metric system. As with other "decisions regarding evidentiary matters," the trial court has "broad discretion" when deciding whether a particular exhibit contains inadmissible hearsay, Scharf, 225 N.J. at 572, with that decision subject to reversal only to correct a "manifest denial of justice." Griffin, 225 N.J. at 413 (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

Hearsay is a statement that "the declarant does not make while testifying at the current trial . . . offer[ed] into evidence to prove the truth of the matter asserted in the statement." N.J.R.E. 801(c). A statement is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." N.J.R.E 801(a). Hearsay is inadmissible at trial, pursuant to Rule 802, unless it falls under one of twenty-seven exceptions codified in Rule 803. It "applies when a declaration is offered to prove the truth of the statement

attributed to the declarant," whereas "if evidence is not offered for the truth of the matter asserted, the evidence is not hearsay and no exception to the hearsay rule is necessary to introduce that evidence at trial." State v. Long, 173 N.J. 138, 152 (2002).

The students did not testify; therefore, their "written assertions" or "statements" were never authenticated. Indeed, plaintiff sought to admit photocopies of the "statements" to prove what the students "learned" as a result of her teaching. Plaintiff argues what each student might have "learned" is a different proffer than using the letters "for the truth of the matter asserted." Plaintiff points to no authority to support her claim that out-of-court writings by non-testifying declarants are exempt from the hearsay prohibitor under Rule 801(c).

In several cases, courts have ruled that out-of-court statements may be offered to show the probable state of mind induced in the listener or reader and that the listener or reader took certain actions after hearing the statements. See Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 4 on N.J.R.E. 801 (2021) (out-of-court statements were admitted "to show that the statement was in fact made and that the listener took certain actions as a result, or to show the probable state of mind induced in the listener.").

By contrast, in State v. Marshall, 123 N.J. 1, 111-12 (1991), the prosecution elicited from a witness that the murder victim had once remarked, "What is it?" when referring to a life insurance policy that her husband, the criminal defendant, had asked her to sign. Id. at 111. The Court held that the statement attributed to the victim—"What is it?"—was inadmissible hearsay because it had been offered to prove the victim's lack of knowledge of the contents of the life insurance application she was signing. Id. at 112.

Here, plaintiff wanted the letters admitted as substantive proof of the existence of facts about the qualities of the metric system in the minds of her students to prove she had imparted those facts to them, that they had comprehended and retained them, and then reproduced them in their letters to Roker. The proffered exhibits could not have served the intended purpose of rebutting defendant's claim that plaintiff's students were not learning if the written assertions contained within the letters were false or inaccurate. But the out-of-court statements go directly to the issue of whether specific knowledge did or did not exist in the minds of the non-testifying declarants, the students. Id. at 112. We conclude the trial judge did not abuse his "broad discretion" in excluding the letters from evidence. Scharf, 225 N.J. at 572.

A-4955-18

V.

Next, plaintiff contends that the trial judge abused his discretion by permitting Mendez, defendant's employability expert, to offer testimony that should have been excluded as a net opinion. The judge permitted Mendez to rebut expert testimony plaintiff had elicited from Monk. In denying plaintiff's motion to exclude Mendez's testimony, the trial judge permitted the testimony "to the degree to which she gets to the heart of the . . . employability issue" and to counter any of the admissible opinions testified to by Monk.

Plaintiff asserts Mendez's testimony was not based on any reliable source or methodology; was purely speculative; went beyond the scope of her report— the changing of grades was not deceptive; it was appropriate for an evaluator who only speaks English to evaluate a foreign language teacher who is teaching in that foreign language; the failure of students to learn is always the fault of the teacher not the students; and the quality of plaintiff's job search.

We reiterate that expert testimony "must concern a subject matter that is beyond the ken of the average juror . . . and . . . the witness must have sufficient expertise." Kelly, 97 N.J. at 208. Mendez's testimony primarily focused on plaintiff's employability and the appropriateness of defendant's protocols, not with plaintiff's objection to the grade changes or whistleblowing activity. No

A-4955-18

portions of Mendez's testimony had any bearing on whether plaintiff met her burden of demonstrating she performed a whistleblowing activity, the second element of her CEPA claim, which the jury found she had not met. Therefore, the admissibility of Mendez's testimony is moot at this juncture.

However, in addressing the merits of plaintiff's argument, we note that Mendez, as the Executive Director of Human Resources, oversaw all employee services and labor relations functions at Newark Public Schools. She holds a doctorate in educational leadership and management. On the basis of Mendez's qualifications and experience, the trial judge found she possessed "the minimal technical training and knowledge essential to the expression of a meaningful and reliable opinion" in her areas of expertise: "educational administration supervision, educational human resources practices . . . teacher termination and improvement, and . . . grading policies and practices in the Newark School District."

In the face of her extensive experience, the trial judge did not abuse his discretion in finding that Mendez's testimony fell within the broad ambit of her expertise. We discern no abuse of discretion. Scharf, 225 N.J. at 572.

## VI.

Next, plaintiff asserts the trial judge erred and abused his discretion by excluding Watson's notes from being admitted into evidence. Watson kept a "substitute feedback journal" on a series of UHS forms in which he filled out comments, observations, and concerns for each of plaintiff's classroom periods, beginning on October 30, 2014, and continuing until at least November 21, 2014. It is unclear from the record what Watson's protocol was in filling out or filing these notes. Frederique testified at his deposition that he did not receive Watson's notes regularly and had not seen them until December 2014, when Watson sent them to Frederique directly.

Prior to trial, defendant moved to exclude the notes and Watson's testimony primarily for their lack of relevance to plaintiff's CEPA claim. The trial judge denied the motion as to Watson's testimony, but granted it as to the notes because they constitute hearsay that did not satisfy any exception. Plaintiff argued two exceptions applied: statements by a party opponent pursuant to Rule 803(b)(4); and the "business records" exception under Rule 803(c)(6). The judge rejected both arguments, finding that Watson was not a party opponent, that his notes were not business records, and that they should not "trump . . . the recollection of the witnesses" who had observed plaintiff's

46

classroom.

During trial, following Sharpe's testimony about the lack of learning in plaintiff's classroom, she renewed her motion to offer Watson's notes about his observations of her classroom in rebuttal to Sharpe's depiction. Again, the judge ruled that the notes were inadmissible hearsay that did not fall under any exception and noted that Watson had, at that point in the trial, already testified as to his observations while in plaintiff's classes.

On appeal, plaintiff has abandoned the argument that the Watson notes were "statements by a party opponent," but maintains that the "business records" exception supported the admissibility of the notes and also claims the notes were admissible under the "present sense impression" exception, pursuant to Rule 803(c)(1).

Rule 803(c)(1) states that when "[a] statement describing or explaining an event or condition [is] made while or immediately after the declarant perceived it and without the opportunity to deliberate or fabricate," the statement is excluded from the hearsay rule. The "immedia[cy]" necessary to trigger the exception has been interpreted to mean "a very brief time between the observation and the statement," State ex rel. J.A., 195 N.J. 324, 338 (2008), such that a ten-minute lapse between a robbery and a witness's statement describing

the robbery was enough to take that statement out of the "present sense impression" exception. Id. at 340.

As to the business records exception, when a statement is made in writing "at or near the time of observation by a person with actual knowledge . . . in the regular course of business" such a writing is excluded by the hearsay rule unless "the sources of information or the method, purpose, or circumstances of preparation indicate that it is not trustworthy." N.J.R.E. 803(c)(6). While "'records which are properly shown to have been kept as required normally possess a circumstantial probability of trustworthiness' . . . this general acceptance of reliability will not attach if 'the trial court . . . entertains serious doubt as to whether they are dependable or worthy of confidence.'" State v. Matulewicz, 101 N.J. 27, 29-30 (1985) (quoting Mahoney v. Minsky, 39 N.J. 208, 218 (1963)).

Apart from hearsay, the trial court may also exclude relevant, otherwise admissible evidence "if its probative value is substantially outweighed by the risk of: (a) undue prejudice, confusion of issues, or misleading the jury; or (b) [u]ndue delay, waste of time, or needless presentation of cumulative evidence." N.J.R.E. 403.

Here, the record is unclear as to several elements necessary for both

48

hearsay exceptions that plaintiff argues are applicable. First, the timing of the notes, a critical component of both exceptions, is ambiguous. At the top of each substitute feedback journal entry is a space in which a specific date is written or typed, but it is not certain whether the entries were written on the day listed, or if they simply described the events from that day. Also, there are no times listed for when the entries were recorded, all of which are written in the past tense. Plaintiff made no proffer or representation concerning how much time had passed between the time when Watson made his observations on which his notes were based and when he composed the notes, or whether the notes were prepared in the ordinary course of business under Rule 803(c)(6).

Counsel for plaintiff, in a pretrial colloquy with the judge, represented that, because Watson was a substitute teacher, he "fills out forms" and "files them with the principal or the vice-principal" who would purportedly keep the notes in the ordinary course of business. No testimony or other evidence supported counsel's assertion that notes, such as Watson's, were regularly kept by defendant in the ordinary course of its business.

Therefore, the trial judge correctly determined that plaintiff failed to meet her burden, as the proponent of the evidence, to show that either the present sense impression exception or the business records exception to the hearsay

49

prohibition applied to Watson's notes.  See State v. Stubbs, 433 N.J. Super. 273, 285-86 (App. Div. 2013) (stating that proponent of hearsay exception faced "burden of persuasion that the out-of-court statement satisfied the elements of an exception to the general rule of inadmissibility").

Moreover, even if the notes were not excludable on hearsay grounds, we conclude the judge acted well within the scope of his discretion as gatekeeper in excluding the notes under Rule 403 because they were unnecessarily duplicative of the observations Watson had already testified to before the jury.

VII.

Plaintiff next argues that the trial judge abused his discretion by allowing Sharpe's, Guinn's, and Frederique's written evaluations to be admitted into evidence.  During plaintiff's case-in-chief, the District sought to introduce Frederique's written observation and evaluation notes taken after observing plaintiff.  Because the judge excluded Watson's written notes from being entered into evidence, plaintiff argues the same ruling should apply to the written evaluations.  Unlike Watson's notes, the judge held the formal written evaluations by the administrators were admissible under the business record exception found in Rule 803(c)(6).  We conclude the judge was correct in his analysis.

Rule 803(c)(6) excludes from the hearsay prohibition a statement made in a writing "at or near the time of observation by a person with actual knowledge . . . in the regular course of business" unless "the sources of information or the method, purpose, or circumstances of preparation indicate that it is not trustworthy." N.J.R.E. 803(c)(6). "For an improvidently admitted hearsay statement to warrant reversal . . . the possibility of an unjust verdict must be real and sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Beasley v. Passaic Cnty., 377 N.J. Super. 585, 604 (App. Div. 2005).

Here, unlike the Watson notes, there was testimony concerning "the regular course of business" with respect to the written evaluations. Mendez testified that under the District's framework for effective teaching, teachers are evaluated according to the common core standards, consistent with State regulations. Mendez then offered the opinion that the October and November 2014 evaluations of plaintiff were conducted in accord with the standards set forth in the framework for effective teaching. Sharpe likewise testified that every teacher evaluation was based on the framework for effective teaching and was "evidence-based."

Frederique testified that the framework required him, when he was the

evaluator, to post an initial write-up online, followed by a post-observation conference with the teacher, after which Frederique would then update the online summary of the evaluation with any relevant evidence or comments made by the teacher or the administrators during the conference. Sharpe explained that plaintiff's ineffectiveness rating from the observation was explained to her at a post-observation conference.

Because Frederique's, Sharpe's, and Mendez's testimonies described the regular business practice by which the administration gave and kept written evaluations of its teachers' effectiveness, and because plaintiff failed to establish there was anything "untrustworthy" about the process, the trial judge did not abuse his discretion by invoking Rule 803(c)(6).

VIII.

Plaintiff also asserts the trial judge erred by admitting the hearsay statements of several of her students as well as Frederique's written notes of his conversations with parents. Because the jury was not being asked to accept the truth of the statements, the evidence was properly admitted.

When, during Frederique's direct testimony, the District's counsel began asking questions about complaints that had been made to Frederique by parents and students about plaintiff, she objected to the out-of-court comments coming

in, arguing they were inadmissible hearsay.

In response to plaintiff's objection, the judge gave the jury a lengthy instruction prior to the introduction of the out-of-court complaints:

> Before we resume the direct examination of . . . Frederique let me give you a little instruction on something that might cut down on our sidebars. In this case you've heard from witnesses on the witness stand, that is, testifying witnesses, comments by other non[-]testifying witnesses. People may have witnessed something that maybe relevant to the case, but they're not here or not coming to testify before you.
>
> That, of course, is hearsay. It's an out-of-court statement. But it's only hearsay if it's being offered for the truth of the matter asserted. So, what that means is it may be relevant for your consideration when coming from the witness only as a means by which you can determine whether it properly forms a basis for a determination that the witness might make, not because what the non-testifying witness said. It may or may not be the truth. And because we don't have the person here to testify there's no way for us to be able to judge whether what the out-of-court person is [telling] is the truth.
>
> . . . [N]evertheless, because the words were heard by a witness on the stand which might have caused him or her to take certain action or to opine about certain things or reach certain conclusions doesn't [mean] its relevant for . . . that purpose, to inform you as to why the witness is saying what he's saying or does what he does or did what he did. Not because it is necessarily true, but the words that were spoken by the out-of-court witness are actually true, only that they were said.

A-4955-18

Over plaintiff's objection, the judge admitted eleven separate out-of-court complaints—four were notes from parents and seven were complaints Frederique received directly from students. Whether proffered statements are hearsay "depend[s] on the [proponent]'s intended use of them and who will present that testimony at the trial." Long, 173 N.J. at 152.

Here, the complaints were admitted to support Frederique's testimony that Sharpe and he placed plaintiff on a thirty-day plan, not as retaliation for her whistleblowing, but because they had received complaints of "student-teacher conflict" in plaintiff's class and had taken actions based on those complaints.

Prior to admitting the notes, the judge had apprised the jury as to the limited and appropriate use of the parents' and students' complaints contained within them as potentially "relevant . . . only as a means by which you can determine whether it properly forms a basis for a determination that the witness might make," or to consider whether "the words were heard by a witness on the stand which might have caused him or her to take certain action or to opine about certain things or reach certain conclusions."

"The authority is abundant that courts presume juries follow instructions." State v. Herbert, 457 N.J. Super. 490, 503 (App. Div. 2019). Contrary to plaintiff's assertion, the probative value of the complaints was substantial with

respect to the fourth element of her CEPA claim under a Rule 403 analysis. If the jury found Frederique's testimony credible that the complaints he received formed his recommendation to take steps toward terminating plaintiff, it would then be less likely that her purported whistleblowing "caused" him to make that recommendation.

The notes were potentially prejudicial to plaintiff, but "[a]ll damaging evidence is prejudicial." State v. Scherzer, 301 N.J. Super. 363, 469 (App. Div. 1997). "[I]t is only when the probative value is substantially outweighed by the potential prejudice that the evidence should be excluded." Ibid. Given the judge's clear instruction on the limited non-hearsay use of these notes, we discern no abuse of discretion in admitting the notes into evidence.

IX.

In her next point, plaintiff contends the trial judge abused his discretion by excluding evidence that she was rated an effective teacher at Barringer for the 2013-2013 school year while allowing evidence plaintiff was rated partially effective at Horton for the 2013-2014 school year. The judge ruled the prior evaluation at Barringer was hearsay, was only marginally relevant, and could confuse the jury.

Plaintiff attempted to introduce her Barringer evaluations through her own testimony and did not intend to call anyone from Barringer to authenticate the records or to testify about her skills as a teacher. To the contrary, the judge admitted evidence of plaintiff's partial effectiveness rating at Horton, which as the District clarified, was relevant to the actions UHS administration took with respects to the corrective action plan.

Plaintiff claims the Barringer evaluation results, which were issued in 2012 within the same district that rated her partially effective in 2013 and ineffective in 2014 were, "critical to demonstrating that the defense of 'ineffective' teaching was a pretext" used to retaliate against plaintiff in violation of CEPA.

The evidential ruling was not an abuse of discretion. Plaintiff does not specify any hearsay exception to justify admitting the writings of non-testifying declarants. Moreover, she has not established any relevant connection between the 2012 evaluation of one group of evaluators and the 2014 evaluations prepared by a different administration at another school. The trial judge correctly determined the 2012 evaluation records were inadmissible hearsay under Rule 802 and were not relevant to any fact of consequence under Rule 401.

In her next point, plaintiff argues the trial judge abused his discretion by excluding evidence that she had been rated effective in various school districts throughout her career. For the reasons expressed, we conclude the judge did not err by excluding these irrelevant hearsay documents.

Next, plaintiff challenges the trial judge's ruling excluding from the record and preventing her counsel from extensively quoting a series of emails. The emails were between plaintiff and Frederique concerning the summer assignment and the letter of reprimand. During her direct testimony, plaintiff testified that on September 24, 2014, in a series of emails, Frederique directed her to remove the summer assignments from her gradebook.

In the first email at issue, Frederique informed plaintiff she was "being directed not to grade" the summer assignment, in part because the directions for completing the assignment were not explicit and because the assignment was having a "detrimental" effect on her students' grades. Plaintiff responded by telling Frederique that many of the students simply "refuse to follow directions" and others "have no shame in lying" and, based on their failure to comply with instructions, the low grades were "what they have to live with." Plaintiff "implore[d]" Frederique to "allow them to learn from the experience" and not to

let them "get away with this by coming and complaining to you." Frederique repeated that he was directing plaintiff "the summer assignment grades should not be incorporated in the student grade" and that the "failure to adhere to this directive will be perceived as insubordination."

We are not persuaded that any portion of the email thread was prejudicially kept from the jury. The judge gave plaintiff broad latitude to testify as to the circumstances surrounding the summer assignment, the requests to remove the summer grades made by Frederique in the email exchange, and the letter of reprimand.

Plaintiff points to nothing in the emails outside of this basic factual summary she had already testified to that would have added any material fact relevant to the jury's understanding of the issues. See N.J.R.E. 403 ("relevant evidence may be excluded if its probative value is substantially outweighed by the risk of . . . needless presentation of cumulative evidence."); L & L Oil Serv., Inc. v. Dir., Div. of Tax'n, 340 N.J. Super. 173, 183 (App. Div. 2001) (holding testimony repeating contents of written correspondence already in record to be unnecessarily duplicative).

A-4955-18

## XI.

Plaintiff also asserts that the trial judge abused his discretion by excluding evidence of grading scandals in other school districts and record-keeping statutes from other states. We are unpersuaded by plaintiff's argument.

During the May 9, 2019 pretrial hearing, the judge ruled the evidence pertaining to other districts and states was "not probative in the least" under Rule 403 and would confuse the jury into speculating whether standards in other states apply here. There was no proffer that plaintiff read the articles or was familiar with laws of other states at the time of her alleged whistleblowing; indeed, her counsel asked the judge to "assume she did not read them before her termination."

On appeal, plaintiff reiterates her argument before the trial judge that the evidence pertaining to the laws and alleged grade alteration scandals in other jurisdictions is relevant to show the objective reasonableness of her belief that the District's actions violated the law or a clear mandate of public policy. Relying on Turner v. Associated Humane Societies, Inc., 396 N.J. Super. 582, 596 (App. Div. 2007), plaintiff contends it is irrelevant whether she was aware of the articles prior to her alleged whistleblowing.

In Turner, where an employee for an animal welfare organization was

A-4955-18

terminated after objecting to the adoption of a dog the group had been paid to euthanize, the trial judge "based his decision granting defendants a directed verdict on the ground that plaintiff did not subjectively believe the dog was actually vicious." Ibid. We reversed, holding that the "objectively reasonable belief" at issue was "not necessarily whether the dog was 'vicious,'" but whether the decision to place for adoption "a dog that had bitten its previous owner and was supposed to be euthanized was inherently 'incompatible' with New Jersey's public policy of protecting its citizens from these animals." Ibid.

The crucial point in Turner was that the trial judge held the wrong subjective belief to the objective reasonableness test under CEPA, not that the judge improperly probed whether plaintiff possessed such a belief. Although the reasonableness of a plaintiff's belief in a CEPA case is an objective standard, the underlying belief itself is one that the plaintiff must have subjectively held.

This interpretation is consistent with the language of the statute, which describes whistleblowing activity as an "object[ion], or refus[al] to participate in any activity, policy, or practice which the employee reasonably believes . . . is incompatible with a clear mandate of public policy," N.J.S.A. 34:19-3(c) (emphasis added). Notably, the standard is not an objection or refusal to a policy or practice that "a reasonable person would believe" is incompatible with a clear

A-4955-18

mandate of public policy.

Here, because plaintiff asked the trial judge to assume that, at the time of the alleged whistleblowing, she was unaware of this evidence, the evidence was necessarily irrelevant to whether she actually believed, at the time she objected to or refused to participate in the alteration of her grades, that the District's conduct was incompatible with public policy. Moreover, it could confuse issues for the jury. See N.J.R.E. 403 (providing that relevant evidence may be excluded "if its probative value is substantially outweighed by the risk of . . . confusion of issues").

The jury, without the benefit of the evidence at issue, found that plaintiff possessed such a reasonable belief in question one of the verdict sheet. Therefore, the abuse of discretion in excluding it, if any, was harmless beyond a reasonable doubt. See State v. Prall, 231 N.J. 567, 581 (2018) ("Our review of the evidentiary determinations cannot end our analysis when we find an abuse of discretion; rather, we must then determine whether any error found is harmless or requires reversal.").

## XII.

Plaintiff also argues the trial judge erred in dismissing her punitive damages claim. Since the jury did not reach the issue of damages, this issue is

moot. We also reject plaintiff's contention that the "cumulative effect of small errors" has prejudiced her, warranting "reversal" of the verdict. In a cumulative error analysis, we "consider the aggregate effect of the trial court's errors on the fairness of the trial." Torres v. Pabon, 225 N.J. 167, 191 (2016). We discern no error, let alone cumulative error, based upon our careful review of the record.

To the extent plaintiff may have posed other arguments in her appeal that we have not specifically addressed, we find those arguments to be of insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). In light of our opinion on plaintiff's appeal, the cross-appeal filed by the District is dismissed.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4955-18